FILED
United States Court of Appeals
Tenth Circuit

January 18, 2023

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT
_____

RIO GRANDE FOUNDATION;
ILLINOIS OPPORTUNITY PROJECT,

    Plaintiffs - Appellants,

v.

MAGGIE TOULOUSE OLIVER, in her
official capacity as Secretary of State of
New Mexico,

    Defendant - Appellee.

No. 22-2004

_____

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:19-CV-01174-JCH-JFR)**
_____

Jacob Huebert, Liberty Justice Center (Daniel R. Suhr on the briefs), Chicago, Illinois,
for Plaintiffs – Appellants.

Nicholas M. Sydow, Solicitor General, Office of the New Mexico Attorney General,
Albuquerque, New Mexico, for Defendant – Appellee.
_____

Before **HARTZ**, **McHUGH**, and **MORITZ**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

    This appeal asks us to explore the boundaries of Article III standing for a First

Amendment challenge to state electioneering rules. Rio Grande Foundation ("RGF") and

Illinois Opportunity Project ("IOP") (collectively, "Appellants") are nonprofit advocacy groups challenging an amendment to New Mexico's Campaign Reporting Act ("CRA"), which requires groups spending over designated amounts on electioneering communications to state their identities on the materials and to disclose the identities of their donors to New Mexico's Secretary of State (the "Secretary"). Appellants claim these requirements burden their First Amendment rights and chilled their planned speech in the 2020 election cycle. The district court dismissed the case at summary judgment for lack of standing, reasoning Appellants showed no injury-in-fact under the framework we laid out in *Initiative and Referendum Institute v. Walker*, 450 F.3d 1082 (10th Cir. 2006).

Exercising jurisdiction under 28 U.S.C. § 1291, we reverse the dismissal in part, holding that RGF had standing to pursue its First Amendment challenge to the amended CRA's disclosure requirement. We affirm the dismissal of IOP's claims, but on grounds different than those relied on by the district court.

## I.    BACKGROUND

### A.    *Factual History*[1]

On de novo review of a grant of summary judgment in a First Amendment case, we consider the entirety of the record submitted. *Citizens for Peace in Space v.*

---

[1] Because this matter comes to us on summary judgment, we first recite the undisputed facts as set forth in the parties' briefs before the district court. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). We then supplement those facts with the declaration and deposition testimony relevant to the disputed facts in the record to fulfill our obligation to consider the entire record in this First Amendment context. *See Essence, Inc. v. City of Fed. Heights*, 285 F.3d 1272, 1283 (10th Cir. 2002).

*City of Colo. Springs*, 477 F.3d 1212, 1219 (10th Cir. 2007); *Essence, Inc. v. City of Fed. Heights*, 285 F.3d 1272, 1283 (10th Cir. 2002).[2]

To begin, we set forth the factual background with respect to the change in New Mexico's election disclosure laws. We then provide the undisputed facts presented to the district court in the parties' motions for summary judgment. Turning to the disputed facts, we include the nature of the parties' disagreement on each point and relevant record evidence. Finally, we provide the procedural background leading to this appeal.

**1.      Senate Bill 3 (2019)**

In 2019, New Mexico adopted Senate Bill 3 (2019) ("SB3"), which amended the CRA to include disclaimer and disclosure requirements for certain electioneering communications. Campaign Finance Reporting Act, ch. 262, 2019 N.M. Laws § 1 (codified as amended at N.M. Stat. Ann. §§ 1-19-26.4, 27.3; *id.* at § 2-21-1). A violation of the CRA is a misdemeanor carrying a fine of up to $1,000 or up to one year imprisonment or both. N.M. Stat. Ann. § 1-19-36.

---

[2] At oral argument, the Secretary objected to Appellants' reliance on deposition testimony beyond the portions the Secretary had highlighted for the district court, and questions arose about whether Appellants could rely in their reply brief on excerpts from the depositions they did not cite in the district court or in their opening appellate brief. All the relevant pages of deposition testimony were in the district court record and are part of the record here, so we properly consider them in their entirety as part of our review in this First Amendment context. *See Essence*, 285 F.3d at 1283 (holding that the appellate court's "review of the record is more rigorous in a First Amendment context," and we are "obligated to make an independent examination of the record in its entirety" (quotation marks omitted)).

The amended CRA requires political committees[3] to register with the Secretary and to disclose (1) the name of the committee with any sponsoring organization and its address; (2) a statement of purpose; (3) the names and addresses of the officers of the committee; and (4) any bank account used for contributions or expenditures.[4] N.M. Stat. § 1-19-26.1(B) and (C). The amended CRA also requires reporting the names and addresses of donors if independent expenditures[5] exceed certain amounts (the "disclosure requirement"), as follows:

---

[3] The CRA defines "political committees" as including "an association that consists of two or more persons whose primary purpose is to make independent expenditures and that has received more than five thousand dollars ($5,000) in contributions or made independent expenditures of more than five thousand dollars ($5,000) in the election cycle." N.M. Stat. Ann. § 1-19-26(Q)(4). The parties do not dispute that Appellants would qualify as "political committees."

[4] An "expenditure" is "a payment, transfer or distribution or obligation or promise to pay, transfer or distribute any money or other thing of value for a political purpose." N.M. Stat. Ann. § 1-19-26(M).

[5] An "independent expenditure" is one that is (1) "made by someone other than a candidate or campaign committee," (2) "not a coordinated expenditure as defined in the [CRA]," and (3) "made to pay for an advertisement that:"

(a) expressly advocates the election or defeat of a clearly identified candidate or the passage or defeat of a clearly identified ballot question;

(b) is susceptible to no other reasonable interpretation than as an appeal to vote for or against a clearly identified candidate or ballot question; or

(c) refers to a clearly identified candidate or ballot question and is published and disseminated to the relevant electorate in New Mexico within thirty days before the primary election or sixty days before the general election at which the candidate or ballot question is on the ballot.

N.M. Stat. Ann. § 1-19-26(N).

A person who makes independent expenditures required to be reported under this section in an amount totaling more than three thousand dollars ($3,000) in a nonstatewide election or nine thousand dollars ($9,000) in a statewide election, in addition to reporting the information specified in Subsection C of this section, shall either:

(1) if the expenditures were made exclusively from a segregated bank account consisting only of funds contributed to the account by individuals to be used for making independent expenditures, report the name and address of, and amount of each contribution made by, each contributor who contributed more than two hundred dollars ($200) to that account in the election cycle; or

(2) if the expenditures were made in whole or part from funds other than those described in Paragraph (1) of this subsection, report the name and address of, and amount of each contribution made by, each contributor who contributed more than a total of five thousand dollars ($5,000) during the election cycle to the person making the expenditures; provided, however, that a contribution is exempt from reporting pursuant to this paragraph if the contributor requested in writing that the contribution not be used to fund independent or coordinated expenditures or to make contributions to a candidate, campaign committee or political committee.

N.M. Stat. Ann. § 1-19-27.3(D). The independent expenditure reports filed under these laws are publicly available online in searchable format. *See* N.M. Stat. Ann. § 1-19-32(C).

The amended CRA also requires a person who makes an independent expenditure for an advertisement over $1,000 (for a single advertisement or in the aggregate during the election cycle) to include on the advertisement the name of the person who authorized and paid for the advertisement (the "disclaimer requirement"), except in certain circumstances where doing so would be impracticable. N.M. Stat. Ann. § 1-19-26.4(A), (B).

5

2.      **Appellants**

   a.      *Undisputed facts*

RGF is a charitable organization whose mission is to inform New Mexico's citizens "of the importance of individual freedom, limited government, and economic opportunity." App. at 76. To support this mission, "RGF engages in issue advocacy [in New Mexico] around topics central to its mission and publishes the 'Freedom Index,' a real-time online voting scorecard tracking legislators' positions on free-market issues." *Id.*

IOP is a social-welfare organization whose mission is to "educat[e] the public about policy driven by principles of liberty and free enterprise." *Id.* IOP engages in issue advocacy in Illinois and has been a plaintiff in lawsuits outside Illinois. IOP has never sent mailers or other advertisements in New Mexico that would have been subject to SB3.

Both RGF and IOP receive individual contributions over $5,000 during an election cycle. All RGF's and IOP's expenditures are made from their general funds.

Prior to filing this lawsuit, neither organization had taken any action that would have subjected it to the disclosure requirement. In the November 2020 election cycle, RGF sent postcards stating whether certain candidates had signed a pledge demanding no tax hikes through the end of the 2021 New Mexico legislative session (the "taxpayer pledge"), but the costs of printing and mailing were under the disclosure requirement's threshold. IOP did not send any mailers in New Mexico during that election cycle.

b.    *Disputed facts*

i.    <u>Prior advocacy</u>

The parties dispute whether either Appellant has a history of engaging in the type of advocacy regulated by SB3 and whether it had any effect on Appellants' advocacy or lack thereof in the November 2020 election cycle.

RGF's president testified that RGF has engaged in issue advocacy in New Mexico since 2000 on many local and state issues through mailers, emails, social media campaigns, and radio advertisements. He stated that, in the November 2020 election cycle, RGF had planned to publicize the results of its Freedom Index by spending over $3,000 in individual legislative districts on mail campaigns. However, instead of its planned advertising campaign, RGF sent the smaller-scale postcard with the taxpayer pledge information and did some social media advertising at a lower expense. RGF's president stated that the decision to downsize the advertising was for "a variety of practical and logistical reasons," including the economic environment at the time. *Id.* at 147–48. The mailers identified RGF as the author.

In his August 2020 declaration, IOP's president stated IOP planned to spend over $9,000 on mailings "to thousands of New Mexico voters within [sixty] days of the November 2020 general election." *Id.* at 30. The mailings were intended to educate voters about an upcoming referendum on an amendment to the New Mexico Constitution and to provide information about "the American tradition of governmental accountability." *Id.* In his subsequent deposition, IOP's president could not recall the precise amount IOP would have spent but confirmed it was over

7

$9,000. However, IOP did not send those mailers. When asked why, IOP's president replied, "I think we filed a lawsuit because we don't want our donors disclosed." *Id.* at 163. Unlike RGF, IOP did not do a smaller-scale advertisement.

### ii.    Concerns about SB3's disclosure requirement

The parties dispute the extent of Appellants' concerns about the potential risks of donor disclosure.

Both Appellants express concern that donors might experience harassment by "intolerant elements in society" due to the groups' controversial positions. App. at 31, 36. At his deposition, RGF's president discussed the experience of a Mozilla executive who had contributed to a controversial campaign and then lost his job, a situation in Arizona where the head of the Goldwater Institute had been subjected to harassment and stalking, and "activists on both sides of the political aisle show[ing] up to Tucker Carlson's house." *Id.* at 153. RGF's president also declared he was personally aware of instances where individuals or organizations affiliated with certain causes or candidates in New Mexico were threatened with or experienced retaliation, as well as harassment, boycotts, and social ostracism, although at his deposition he could not recall any details. He further stated that one of RGF's board members had "a very aggressive approach taken by somebody involved in an issue that we were dealing with" and "I've had politicians . . . take aggressive approaches to expressing their displeasure with what we're doing." *Id.* at 155. RGF's president admitted, however, that New Mexico does not have as many "volatile issues" as some states and RGF had no plans to make expenditures on hot-button issues that he had

8

flagged as raising a risk of retaliation. *Id.* at 151. But he immediately qualified that assertion, explaining "[t]hings can change quickly" and some of those issues were potentially related to "upcoming mailings, postcards, Freedom Index-related, where we list X, Y and Z votes, those would certainly be included in there, environmental especially, in this session." *Id.* at 154. He testified, "[W]e haven't had anything escalate to a point where it would become a direct threat . . ., yet it's something that we definitely want to try to avoid." *Id.* at 155. He also expressed concern that disclosed information is more accessible now, via the internet, than it used to be.

Similarly, IOP's president expressed apprehension about "the cancel culture that we're currently at today" and gave an example of Major League Baseball leaving Georgia due to harassment and criticism because it disagreed with a policy decision by the Georgia legislature. *Id.* at 165.

Although they are not aware of any past harassment of or retaliation against anyone affiliated with their own organizations, both Appellants' presidents testified that donors have expressed fear of disclosing their identities. Both presidents admitted donors have not explicitly said they would not donate if their identities were made public, but both declared their belief that donor disclosure would make donors less likely to contribute and fundraising more difficult, saying they knew donors who would cease donating if their identities were made public. At his deposition, RGF's president testified he has heard people say, "I can't donate to you because I'm afraid my donation will be made public." *Id.* at 151. He stated, "[I]t is something that comes up in conversations with donors on a fairly regular basis. . . . It's an issue that people

9

want to know about." *Id.* at 154. IOP's president stated that, based on "general conversations," he thinks donors "look at examples . . . that are happening currently like the All-Star game moving, and they think about their own well-being," and he believes privacy is "the reason why they support our organization." *Id.* at 165.

In their declarations, both organizations' presidents also expressed concern that if their members, supporters, and donors were disclosed, their target audiences might focus on who is paying for the messages rather than the ideas presented in them.

### iii.    Future plans

The parties dispute whether either organization has plans to engage in the type of speech regulated by SB3 in the future.

In his declaration, RGF's president stated, "RGF intends to engage in substantially similar issue speech in future New Mexico elections." App. at 35. At his deposition, he testified that RGF was considering a mailing about a federal congressional election happening less than two months after his deposition, stating, "this is all very rapid-fire stuff that is happening." *Id.* at 152. He said RGF did not have any plans to make expenditures on hot-button issues, but that things can change quickly. RGF's president explained that although RGF believed the taxpayer pledge information was more important than the Freedom Index scores in the November 2020 election cycle, "I don't know if we would do something like that again." *Id.* at 148. He also testified, "[T]he donor disclosure thing is a very serious issue for us, and barring some legal change or a victory in court, we probably will withhold

spending above the $3,000 threshold for the foreseeable future." *Id.* at 152. When asked, "If you were victorious in this lawsuit or did not have the legal restrictions you discussed, would you spend more than $3,000 in any legislative district to make these kind of mail communications?" he replied, "It's quite possible, yes." *Id.*

IOP's president declared IOP intends to engage in similar issue speech in future New Mexico elections. However, at his deposition, he testified he was unsure if IOP would make independent expenditures in New Mexico in the future. He admitted IOP had not engaged in any other advocacy in New Mexico and stated IOP had no immediate plans to do so, although "we look at policy across the country" and "[t]here may be" issues about which IOP would like to speak. *Id.* at 165. IOP's president affirmed that "depending on what policies might arise in New Mexico, [IOP] may engage in issue advocacy." *Id.* He further explained, "We look at policy across the country, and if we feel like we want to engage, then we will do that." *Id.* at 163. When asked if there were any particular policies about which IOP intended to engage in substantially similar speech in New Mexico in the future, he replied, "I don't know what policies are going to happen in the future, so I can't answer that." *Id.* He stated, "I don't know what policy where at [*sic*], but I'm constantly looking all over the country and working all over the country." *Id.*

### B.    *Procedural History*

Appellants filed a complaint in December 2019, and an amended complaint in February 2020, challenging SB3. In their amended complaint, Appellants asserted they wished to send advertisements that would be subject to the amended CRA in the

11

November 2020 election cycle. They requested injunctive and declaratory relief, claiming that requiring them to disclose their members and supporters violated their rights to free association and speech and that requiring them to register and disclose their sponsorship of issue advocacy also violated their free speech rights.[6]

In August 2020, Appellants moved for a preliminary injunction, attaching declarations from their organizations' presidents. The district court denied the motion, determining Appellants could not show a substantial likelihood of success on the merits because New Mexico had "an interest in informing the electorate of the sources of significant funding" for advertisements shortly before an election, which the district court believed outweighed Appellants' concerns.[7] *Id.* at 50. The district court acknowledged that the disclaimer requirement compels speech and infringes on Appellants' right to privacy and anonymity, but determined the interests of the state outweigh those burdens.

After the district court denied the preliminary injunction, the parties proceeded to discovery and both organizations' presidents sat for depositions in April 2021. The parties then filed cross-motions for summary judgment. Making a facial challenge to SB3, Appellants argued the disclosure and disclaimer requirements were

---

[6] Count III asserted the Secretary lacked constitutional authority to promulgate SB3. Appellants voluntarily dismissed Count III prior to the district court's summary judgment ruling.

[7] After the district court denied the preliminary injunction, the Supreme Court issued *Americans for Prosperity Foundation v. Bonta*, 141 S. Ct. 2373 (2021), which held California's donor disclosure requirements unconstitutional.

unconstitutional. Appellants relied exclusively on the declarations they had previously submitted with their preliminary injunction motion without mentioning the depositions. The Secretary's response and cross-motion argued Appellants lacked standing to bring a facial challenge to SB3 because they were not injured by the challenged laws.[8] The Secretary submitted relevant pages of the depositions, highlighting the portions cited in its brief. In their reply/response, Appellants again relied almost exclusively on the declarations.

The district court granted the Secretary's motion for summary judgment, determining the court lacked subject matter jurisdiction due to lack of Article III standing. Applying *Walker*, 450 F.3d 1082, the district court held Appellants lacked standing because they could not show an injury-in-fact. Specifically, the district court concluded Appellants had not presented evidence that they had previously engaged in speech that would be affected by SB3 or that they had a plausible claim their speech was presently chilled by a credible threat SB3 would be enforced against them.

The Appellants filed a timely appeal.

## II.   DISCUSSION

On appeal, Appellants argue the district court erred in determining they lacked standing. They contend the district court (1) wrongly evaluated the facts at the time of the summary judgment motions rather than at the time the complaint was filed, and

---

[8] In the alternative, on the merits the Secretary contended the laws served important informational interests for voters and were narrowly tailored.

(2) failed to make inferences in their favor as required at the summary judgment stage. They also argue that (3) the district court should have applied the doctrine of mootness instead of standing, and concluded their case is not moot.

We first set forth the appropriate standard of review. We then address our power to hear this appeal, beginning with the doctrine of standing and proceeding to the doctrine of mootness. Ultimately, we hold the district court correctly concluded Appellants lacked standing to challenge the disclaimer requirement because they showed no injury-in-fact. With respect to the disclosure requirement, however, we conclude the district court erred in finding RGF lacked standing, and RGF's claim is not moot. Thus, we reverse the dismissal as to that claim. As for IOP, we need not determine whether it had standing to challenge the disclosure requirement because its claim is moot. Accordingly, we affirm the decision of the district court as to IOP.

### A.    Standard of Review

We review a grant of summary judgment de novo, "applying the same standard for summary judgment that applied in the district court." *Sandoval v. Unum Life Ins. Co. of Am.*, 952 F.3d 1233, 1236 (10th Cir. 2020). Summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court views the evidence and makes reasonable inferences in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). We "need not defer to factual findings rendered by the district court." *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1180 (10th Cir. 2018) (citation and internal quotation marks omitted). On a

14

free speech claim, the court must make "an independent examination of the whole record" to ensure the decision does not "constitute a forbidden intrusion on the field of free expression." *Citizens for Peace in Space*, 477 F.3d at 1219 (quoting *Bose*, 466 U.S. at 499).

Standing and mootness are questions of law reviewed de novo. *Brown v. Buhman*, 822 F.3d 1151, 1168 (10th Cir. 2016). To survive a summary judgment challenge to standing, "the plaintiff must set forth by affidavit or other evidence specific facts that, if taken as true, establish each of the elements of standing." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). "A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155–56 (1990)).

### B.    *Legal Standard: Justiciability*

Article III of the Constitution permits federal courts to decide only "Cases" or "Controversies." U.S. Const. art. III, § 2. This requires "a genuine, live dispute between adverse parties, thereby preventing the federal courts from issuing advisory opinions." *Carney v. Adams*, 141 S. Ct. 493, 498 (2020). The "case-or-controversy" requirement "is built on separation-of-powers principles and serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). Although the primary concern is jurisdictional, the case-or-controversy requirement also protects judicial economy, ensuring "the scarce resources of the federal courts are devoted to those

15

disputes in which the parties have a concrete stake." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000).

The doctrines of standing and mootness aim to ensure federal courts stay within Article III's bounds throughout the litigation.[9] *See id.* at 189 ("The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997))). "Standing concerns whether a plaintiff's action qualifies as a case or controversy when it is filed; mootness ensures it remains one at the time a court renders its decision." *Brown*, 822 F.3d at 1163. The party invoking federal jurisdiction "bears the burden of establishing standing as of the time it brought [the] lawsuit and maintaining it thereafter." *Carney*, 141 S. Ct. at 499 (citing *Lujan*, 504 U.S. at 561). "Failure to satisfy the requirements of either doctrine places a dispute outside the reach of the federal courts." *Brown*, 822 F.3d at 1164.

### C.    *Application*

### 1.    **Standing**

"A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." *Davis v. Fed. Election Comm.*, 554 U.S. 724,

---

[9] A third doctrine, ripeness, "aims to prevent courts from entangling themselves in abstract disagreements by avoiding premature adjudication." *Cellport Sys., Inc. v. Peiker Acustic GMBH & Co. KG*, 762 F.3d 1016, 1029 (10th Cir. 2014) (quotation marks omitted).

734 (2008). The doctrine of standing requires a litigant to "prove [1] he has suffered a concrete and particularized injury [2] that is fairly traceable to the challenged conduct, [3] and is likely to be redressed by a favorable judicial decision." *Carney*, 141 S. Ct. at 498 (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013); *Lujan*, 504 U.S. at 560–61).

In the First Amendment context, the Supreme Court has recognized a "lessening of prudential limitations on standing" due to the difficulty of showing an injury-in-fact for certain First Amendment claims, *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984), such as chilled speech or pre-enforcement challenges, *see Peck v. McCann*, 43 F.4th 1116, 1133 (10th Cir. 2022) (explaining the bar to show standing "is not supposed to be a difficult bar for plaintiffs to clear in the First Amendment pre-enforcement context"); *see also* Wright & Miller, 13A Fed. Prac. & Proc. § 3531.4 (3d ed.) ("The nature of First Amendment rights readily supports recognition of injury; the importance of these rights supports recognition of rather attenuated injury.").

We have acknowledged the inherent difficulty of showing an injury-in-fact on a chilled speech claim, because such injuries are, by definition, inchoate: the speech "has not yet occurred and might never occur, yet the government may have taken no formal enforcement action." *Walker*, 450 F.3d at 1088. Accordingly, an injury-in-fact exists where a chilling effect "arise[s] from an objectively justified fear of real consequences, which can be satisfied by showing a credible threat of prosecution or

other consequences following from the statute's enforcement." *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004).

In *Walker*, we evaluated the standing of advocacy groups making a First Amendment challenge to a state constitutional provision requiring a supermajority to pass wildlife-related initiatives. 450 F.3d at 1085. We determined the groups had standing because they "provide[d] sufficiently concrete manifestations of desire to pursue a wildlife initiative," including "past and current conduct in preparation or support for such initiatives in Utah and surrounding states, their allegations regarding their desire to use the initiative process (but for the effect of [the challenged provision]), and their claims that the supermajority requirement is the reason they are not currently pursuing initiatives." *Id.* at 1090. *Walker* formalized a three-part framework as follows:

> We hold that plaintiffs in a suit for prospective relief based on a "chilling effect" on speech can satisfy the requirement that their claim of injury be "concrete and particularized" by (1) evidence that in the past they have engaged in the type of speech affected by the challenged government action; (2) affidavits or testimony stating a present desire, though no specific plans, to engage in such speech; and (3) a plausible claim that they presently have no intention to do so *because of* a credible threat that the statute will be enforced.

*Id.* at 1089. "If the plaintiffs satisfy these three criteria, it is not necessary to show that they have specific plans or intentions to engage in the type of speech affected by the challenged government action." *Id.*

*Walker* provides an example of circumstances giving rise to standing on a chilled speech claim; where those factors exist, standing exists. *Id.* However, *Walker*

acknowledged circumstances might satisfy the relatively relaxed standard for an injury-in-fact on a chilled speech claim without meeting all the *Walker* factors. *Id.* For example, the first *Walker* factor—evidence of past relevant speech—is not essential because "people have a right to speak for the first time."[10] *Id.* While past relevant speech can lend "concreteness and specificity" to the claimed injury, it "obviously cannot be an indispensable element" of standing. *Id.* (explaining plaintiffs "can" show injury-in-fact on a chilled speech claim by satisfying the three *Walker* factors); *cf. Peck*, 43 F.4th at 1131 (explaining that the fact certain aspects of a particular case *suffice* to show an element of standing does not mean those elements are *necessary* to show that element of standing). The fundamental inquiry remains the one that pre-dates *Walker*: "The chilling effect, to amount to an injury, must arise from an objectively justified fear of real consequences, which can be satisfied by showing a credible threat of prosecution or other consequences following from the statute's enforcement." *D.L.S.*, 374 F.3d at 975; *see Walker*, 450 F.3d at 1088.

It is axiomatic that standing is evaluated as of the time a case is filed. *See Friends of the Earth*, 528 U.S. at 180; *Brown*, 822 F.3d at 1163; *see also S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1152–53 (10th Cir. 2013) (explaining that, where an amended complaint supersedes an original complaint, standing is determined as of the time the first complaint was filed). However, "an initial

---

[10] Additionally, we note that past relevant speech might have been chilled, in which case lack of past speech would not show lack of injury.

19

conclusion that plaintiffs have standing is subject to reexamination, particularly if later evidence proves inconsistent with that conclusion." *Friends of the Earth*, 528 U.S. at 201 (Scalia, J. & Thomas, J., dissenting) (citing *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 115, 115 n.31 (1979) ("[I]t sometimes remains to be seen whether the factual allegations of the complaint necessary for standing will be supported adequately by the evidence.")); *see also Wyoming v. Oklahoma*, 502 U.S. 437, 446 (1992) ("[I]f convinced . . . that we were clearly wrong in accepting jurisdiction of this case, we would not hesitate to depart from our prior rulings."). Furthermore, "the proof required to establish standing increases as the suit proceeds." *Davis*, 554 U.S. at 734. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," while on summary judgment, the plaintiff "must 'set forth' by affidavit or other evidence 'specific facts,' . . . which for purposes of the summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561 (quoting Fed. R. Civ. P. 56(e)).

Regardless of the stage of litigation at which the court evaluates standing, the standing inquiry remains focused on whether the party invoking jurisdiction had a sufficient stake in the outcome when the suit was filed. *Davis*, 554 U.S. at 734; *Friends of the Earth*, 528 U.S. at 180; *Arizonans for Official English*, 520 U.S. at 68 n.22. Thus, the inquiry before the district court was—and our question is—whether Appellants had a personal stake in a case or controversy at the time they filed their complaint, in light of all the evidence we now have, construed in the light most favorable to Appellants and making reasonable inferences in their favor.

20

### a.    *The disclaimer requirement*

The district court rightly determined Appellants lacked standing to challenge the requirement that they identify themselves on their electioneering materials because there is no evidence suggesting this disclaimer requirement ever affected Appellants' speech or conceivably would affect their speech. *Cf. Rio Grande Found. v. City of Santa Fe*, 7 F.4th 956, 960–61 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 1670 (2022) (determining RGF lacked standing to make a chilled speech claim where it averred intent to speak despite challenged municipal ordinance, negating the claimed chill). Appellants' past mailers and advertisements voluntarily included the identity of the senders and both organizations' presidents stated they preferred to identify themselves on their materials. *See* App. at 155 (explaining if RGF is "going to spend money on something, [it is] going to put [its] name on it"); *id.* at 162 (expressing IOP's belief it was "best practice" to identify itself on its materials). Where both organizations are already committed to identifying themselves on their materials, neither will be deterred from speaking by a requirement that they continue to do so.

Appellants suggest they do not need to show the disclaimer requirement would chill their speech, only that it would deprive them of their right to choose whether to identify themselves. This is little more than a statement that Appellants disagree with the requirement, and disagreement is not an injury-in-fact. *See Laird v. Tatum*, 408 U.S. 1, 13 (1972) (explaining mere disagreement with government policy was not enough for standing; there must be a direct injury). Because Appellants cannot show

21

any past, present, or future injury from the disclaimer requirement, they lack standing to challenge it.

   b.    *The disclosure requirement*

The district court concluded RGF lacked standing to challenge the disclosure requirement because it could not satisfy the first and third *Walker* factors. We disagree with that conclusion and the district court's interpretation of *Walker*. Put simply, *Walker* intended to reflect the low bar for showing standing on a chilled speech claim, not raise that bar.

   i.    Past relevant speech

In concluding RGF failed to satisfy the first *Walker* factor, the district court focused on the fact RGF has not historically spent the amount of money on political advertisements that would trigger SB3.[11] But RGF was not required to make such a showing. In *Walker*, we noted that past speech was not necessary at all, 450 F.3d at 1089, let alone past speech of the precise scale as would trigger the challenged law. Past relevant speech, where it exists, simply helps to differentiate the plaintiff's specific, concrete alleged injury from the general, hypothetical interest of the public. *Id*; *see generally O'Rourke v. Dominion Voting Sys., Inc.*, No. 21-1161, 2022 WL

---

[11] The parties do not dispute that RGF's prior expenditures were below the amount that would have triggered the disclosure requirement, so we assume that fact for purposes of this appeal. However, we do not express an opinion on the correctness of that conclusion. It appears to be based on an underlying assumption that the only costs to advertising considered "expenditures" under the CRA are the costs of dissemination, *e.g.*, printing and mailing costs, an assumption that may not be warranted given the lack of limiting language in the statute or regulations.

22

1699425, at *2 (10th Cir. May 27, 2022) (explaining injury-in-fact cannot be harm identical to "every citizen's interest in proper application of the Constitution and laws" or seek "relief that no more directly and tangibly benefits [them] than it does the public at large" (quoting *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam))). Even advertisements of a smaller scale may help to define the contours of the alleged injury to distinguish it from the generalized interest everyone has in free speech.

RGF's past advocacy does just that. It is undisputed that RGF's mission since 2000 has been to inform New Mexico's citizens of its views and it engages in issue advocacy in pursuit of that mission. RGF's president testified that, in addition to publishing the online Freedom Index, RGF has engaged in issue advocacy in New Mexico on many local and state issues through mailers, emails, social media campaigns, and radio advertisements. Furthermore, RGF made plans to publicize the results of its Freedom Index by spending over $3,000 in individual legislative districts on mail campaigns within sixty days of the November 2020 election. These past actions lend ample "concreteness and specificity" to what would otherwise be an "inchoate" injury, satisfying the first *Walker* factor. *See* 450 F.3d at 1088.

The district court determined that RGF's failure to send its planned 2020 mailers weighed against standing. But the fact that RGF planned the mailers in the first place supports that they had a concrete interest in challenging SB3 at the time they filed the lawsuit. *Cf. id.* at 1090–91 (concluding the first *Walker* factor satisfied by "past and current *conduct in preparation or support for* such initiatives in Utah

23

and surrounding states" (emphasis added)). Furthermore, their eventual failure to send the mailers weighed in favor of standing, not against it, because it suggested the speech was chilled. *Cf. Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 976 (10th Cir. 2020) (explaining acquiescence to a law does not defeat standing to challenge it). It is true RGF's president did not explicitly blame SB3 for abandoning the original mailers and cited other factors as relevant to the decision. But he also testified about his organization's practice of tailoring its advertisements to avoid triggering disclosure requirements, making it reasonable to infer that the disclosure requirement played at least some part.

   ii. <u>Evidence showing a present desire to engage in affected speech</u>

*Walker*'s second factor is not meant to be difficult to satisfy; affidavits stating a general desire suffice. *Peck*, 43 F.4th at 1130–32; *Rio Grande*, 7 F.4th at 960 (stating affidavit averring a "desire to continue speaking about municipal ballot measures in the future" sufficed because "[n]othing more concrete than this general aspiration is needed to meet [*Walker*'s] second prong"). Even in the absence of direct evidence, circumstances from which a court can infer a present desire also suffice. *See Walker*, 450 F.3d at 1091. A plaintiff need not show the specific content or likely timing of their desired speech. *Peck*, 43 F.4th at 1131–32 ("Such a barrier would be so daunting as to obviate the leniency we generally apply to First Amendment standing inquiries.").

RGF's president declared his organization wished to send mailers in the 2020 election cycle and "intends to engage in substantially similar issue speech in future

24

New Mexico elections." App. at 35. The district court properly determined this met

the low bar for standing purposes. The Secretary's arguments to the contrary are

primarily challenges to the strength of the evidence, arguing the deposition testimony

contradicted this statement and was vague. At the summary judgment stage, however,

the court must view the evidence in the light most favorable to RGF and make

reasonable inferences in its favor. Thus, the district court properly found RGF

adequately showed a desire to engage in future speech affected by SB3.

### iii.    A plausible chill

The district court found that RGF did not show a "*plausible* claim" because the

district court believed evidence cast doubt on whether RGF would engage in speech

regulated by SB3 in the future. *Id.* at 229 (quoting *Rio Grande*, 7 F.4th at 959). But

the third *Walker* factor is not an invitation for the district court to evaluate the

strength of the plaintiff's evidence that it will, in fact, be chilled.[12] *See Day v. Bond*,

500 F.3d 1127, 1137 (10th Cir. 2007) ("Practically speaking, *Walker* mandates that

we assume, during the evaluation of the plaintiff's standing, that the plaintiff will

prevail on his merits argument."). And it certainly does not require the plaintiff to

prove he will actually engage in speech affected by the law in the future; a plaintiff

on a chilled-speech claim "by definition does not—indeed, should not—have a

present intention to engage in that speech at a specific time in the future." *Walker*,

---

[12] We admit our use of the word "plausible" in *Walker* and *Rio Grande* may have injected confusion into the district court's analysis of the third *Walker* factor.

25

450 F.3d at 1089; *accord Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014) ("Nothing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law.").

Rather, the third *Walker* factor asks whether the alleged chill "arise[s] from an objectively justified fear of real consequences." *D.L.S.*, 374 F.3d at 975. Put another way, standing on a chilled-speech claim requires both subjective and objective deterrence—*i.e.*, not just that the plaintiff claims to be deterred by the challenged law but that the challenged law would plausibly deter a reasonable person in the plaintiff's position. *Rio Grande*, 7 F.4th at 960. The subjective chill here is obvious: evidence shows that donor privacy is important to RGF and it tailors its speech to avoid triggering donor disclosure requirements. The objective chill is equally obvious: the law punishes violations with penalties including a fine or imprisonment. N.M. Stat. Ann. § 1-19-36; *see Peck*, 43 F.4th at 1133 (assuming a state will enforce its own laws in the absence of evidence to the contrary). A reasonable organization would refrain from desired speech—here, larger-scale and therefore costlier advertisements—where speaking without disclosing donors would subject it to statutory penalties but disclosing donors would alienate them.

In sum, RGF showed an injury-in-fact because it did far more than claim harm identical to "every citizen's interest in proper application of the Constitution and laws" or seek "relief that no more directly and tangibly benefits [them] than it does the public at large." *O'Rourke*, 2022 WL 1699425, at \*2 (quoting *Lance*, 549 U.S. at

26

439). At the time it filed its complaint, RGF had a specific interest in challenging the disclosure requirement because there was an objective risk the law would affect RGF's ability to engage in desired speech, and relief from the court would have eliminated the potential chilling effect of the law. Thus, RGF had standing to challenge the disclosure requirement.

Because we now conclude IOP's challenge to the disclosure requirement is moot, we do not address whether it had standing to bring its claim.

**2.    Mootness**

The district court did not address mootness because it determined Appellants lacked standing. Because we have an independent duty to ensure ourselves of our own jurisdiction, *Amazon, Inc. v. Dirt Camp, Inc.*, 273 F.3d 1271, 1274 (10th Cir. 2001), we evaluate whether the passing of the November 2020 election mooted Appellants' challenges to the disclosure requirement. We conclude RGF's claim is not moot. In contrast, IOP's claim is moot and ineligible for the claimed exception.

The doctrine of mootness ensures that a case or controversy exists throughout the proceedings. *See Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013) (explaining that an "actual controversy must be extant at all stages of review, not merely at the time the complaint is filed" (quoting *Arizonans for Official English*, 520 U.S. at 67)). Mootness is often described as "standing set in a time frame"; although the comparison is not a perfect one, with rare exceptions "[t]he requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Ajaj v. Fed. Bureau of Prisons*,

27

25 F.4th 805, 811 (10th Cir. 2022) (internal quotation marks omitted). The defendant generally has the "stringent" burden of persuasion on mootness by showing that "subsequent events ma[k]e it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 189 (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)).

In deciding whether a case is moot, "[t]he crucial question is whether granting a present determination of the issues offered . . . will have some effect in the real world." *Kan. Jud. Rev. v. Stout*, 562 F.3d 1240, 1246 (10th Cir. 2009) (quotation marks omitted). "When it becomes impossible for a court to grant effective relief, a live controversy ceases to exist, and the case becomes moot." *Id.*; *see also Ind v. Colo. Dep't of Corr.*, 801 F.3d 1209, 1213 (10th Cir. 2015) ("[A] case becomes moot when a plaintiff no longer suffers actual injury that can be redressed by a favorable judicial decision." (internal quotation marks omitted)).

Courts recognize various "exceptions" to mootness that allow jurisdiction despite an apparent lack of any live case or controversy. *See Brown*, 822 F.3d at 1166–67. As relevant here, these exceptions include where an alleged injury is "capable of repetition, yet evading review," which applies where (1) "the challenged action ended too quickly to be fully litigated" and (2) "a reasonable expectation exists for [the plaintiff] to again experience the same injury." *Marks v. Colo. Dep't of Corr.*, 976 F.3d 1087, 1093–94 (10th Cir. 2020) (internal quotation marks omitted). Challenges to election laws may readily satisfy the first element, as injuries from

28

such laws are capable of repetition every election cycle yet the short time frame of an election cycle is usually insufficient for litigation in federal court. *See*, *e.g.*, *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007). The second element may be more difficult to show, although the bar is not meant to be high. *See Honig v. Doe*, 484 U.S. 305, 318 n.6 (1988) (explaining that, to avail itself of this exception to mootness, a plaintiff need not show that "a recurrence of the dispute [is] more probable than not"). Even a statement expressing intent to engage in the relevant speech might suffice. *See Davis*, 554 U.S. at 736; *see also First Nat. Bank of Bos. v. Bellotti*, 435 U.S. 765, 775 (1978) (applying the exception where "[a]ppellants insist that they will continue to oppose the constitutional amendment").

    *a.*    *RGF*

RGF's challenge to the disclosure requirement is not moot because determining the law's constitutionality would have a real effect on RGF. *See Kan. Jud. Rev.*, 562 F.3d at 1246. RGF's president testified that donor disclosure laws continue to shape RGF's advocacy. He testified, "[T]he donor disclosure thing is a very serious issue for us, and barring some legal change or a victory in court, we probably will withhold spending above the $3,000 threshold for the foreseeable future." *Id.* at 152. When asked, "If you were victorious in this lawsuit or did not have the legal restrictions you discussed, would you spend more than $3,000 in any legislative district to make these kind of mail communications?" he replied, "It's quite possible, yes." *Id.* If the disclosure requirement were invalidated, RGF could

29

cease tailoring its advocacy to avoid triggering the law. Accordingly, RGF's challenge to the disclosure requirement is not moot.

b.    IOP

In contrast, IOP's challenge is moot because invalidating the disclosure requirement would not affect IOP. There is no evidence from which to infer IOP has any reasonable probability of engaging in speech in New Mexico in the future, let alone speech that would be subject to the disclosure requirement. IOP's president stated that the organization "look[s] at policy across the country, and if we feel like we want to engage, then we will do that." *Id.* at 163. The vague possibility IOP might someday be interested in speaking in New Mexico on some unidentified topic hardly shows that invalidation of the law would redress any potential injury to IOP.

IOP is not eligible for the exception for injuries "capable of repetition yet evading review" because IOP has not shown any reasonable probability the controversy will reoccur. Although IOP's president stated in his declaration that "IOP intends to engage in substantially similar issue speech in future New Mexico elections," App. at 30, his deposition testimony revealed that any such intent is entirely conditional and speculative. *Cf. Kan. Jud. Rev.*, 562 F.3d at 1248 (explaining a claim was "so imbued with speculation and remoteness that [it] cannot serve as a foundation for our circumspect jurisdictional inquiry"). Evidence that IOP will scour the entire country for issues that pique its interest, and engage if it is so inclined, does not show intent to engage in speech subject to New Mexico's disclosure requirement. There is not even any basis to *infer* such intent. IOP has never spoken or

wanted to speak in New Mexico other than during the November 2020 election cycle. IOP's one-time attempt to advertise in New Mexico differed materially from its past advocacy, which has either been in Illinois or taken the form of lawsuits, not advertising.

The conclusion that IOP is ineligible for the exception does not run afoul of the Supreme Court's caution that a plaintiff need not identify specific future speech that will be affected by the challenged rule to benefit from this mootness exception. In *Wisconsin Right to Life*, the Court explained:

> We have recognized that the "capable of repetition, yet evading review" doctrine, in the context of election cases, is appropriate when there are "as applied" challenges as well as in the more typical case involving only facial attacks. Requiring repetition of every "legally relevant" characteristic of an as-applied challenge—down to the last detail— would effectively overrule this statement by making this exception unavailable for virtually all as-applied challenges. History repeats itself, but not at the level of specificity demanded by the [party asserting mootness].

551 U.S. at 463. The Court explained that, where the speaker (1) credibly claimed that it planned "materially similar" future advertisements and (2) there was no reason to believe the government would not prosecute violations, there was "a reasonable expectation that the same controversy involving the same party will recur." *Id.* at 463–64. Here, there is insufficient evidence that IOP has a credible plan to make any materially similar future advertisement, and thus no reasonable expectation of recurrence.

Appellants assert the exception should apply because of the future risk to others even if not to Appellants, citing *Storer v. Brown*, 415 U.S. 724, 737 n.8

31

(1974). We generally disfavor this argument. *See Hendrickson v. AFSCME Council 18*, 992 F.3d 958 n.10 (10th Cir. 2021) ("[O]ur cases prevent us from applying the mootness exception based on a risk to others." (quotation marks omitted), *cert. denied*, 142 S. Ct. 423 (2021)). Even if we endorsed it, we would decline to apply it to IOP because those other interests would be adequately represented by RGF. Thus, IOP is ineligible for this mootness exception.

## III.    CONCLUSION

The evidence construed in the light most favorable to RGF shows that RGF had a personal stake in a case or controversy about the disclosure requirement at the time it filed its complaint and maintained that interest thereafter. We accordingly REVERSE the dismissal of RGF's challenge to the disclosure requirement and REMAND to the district court. We otherwise AFFIRM the decision of the district court.