FILED
United States Court of Appeals
Tenth Circuit

October 1, 2024

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

### UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

_____

M. S.; L. S.; C. J. S.,

      Plaintiffs - Appellees,

v.

PREMERA BLUE CROSS,

      Defendant - Appellant,

and

MICROSOFT CORPORATION;
MICROSOFT CORPORATION
WELFARE PLAN,

      Defendants.

_____

M. S.; L. S.; C. J. S.,

      Plaintiffs - Appellees,

v.

MICROSOFT CORPORATION;
MICROSOFT CORPORATION
WELFARE PLAN,

      Defendants - Appellants,

and

No. 22-4056

No. 22-4061

PREMERA BLUE CROSS,

Defendant.

_____

**Appeals from the United States District Court
for the District of Utah
(D.C. No. 2:19-CV-00199-RJS)**

_____

Gwendolyn C. Payton, Kilpatrick Townsend & Stockton, LLP, Seattle, Washington (John R. Neeleman, Kilpatrick Townsend & Stockton, LLP, Seattle, Washington, Adam H. Charnes, Kilpatrick Townsend & Stockton, LLP, Dallas, Texas, and Timothy C. Houpt, Parsons Behle & Lattimer, P.C., Salt Lake City, Utah with her on the briefs) for Defendants-Appellants.

Brian S. King (Tera J. Peterson, with him on the brief), Brian S. King, P.C., Salt Lake City, Utah, for Plaintiffs-Appellees.

_____

Before **HARTZ**, **MORITZ**, and **ROSSMAN**, Circuit Judges.

_____

**ROSSMAN**, Circuit Judge.

_____

This case began when Plaintiffs M.S. and L.S. sought insurance coverage for mental health treatments provided to their child, C.S. (collectively, Plaintiffs or the Family). The health benefits plan at issue—offered by M.S.'s employer—is subject to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132, and the Mental Health Parity and Addiction Equity Act of 2008 (the Parity Act), 29 U.S.C. § 1185a.

2

Defendants denied the benefits claim. Plaintiffs sued in federal district court, alleging Defendants improperly denied benefits under ERISA, failed to produce certain documents in violation of ERISA's disclosure requirements, and violated the Parity Act by impermissibly applying disparate treatment limitations to claims for mental health care. On cross-motions for summary judgment, the district court granted summary judgment to Defendants on the denial-of-benefits claim. Plaintiffs do not appeal that order. As to the Parity Act and ERISA disclosure claims, the district court granted summary judgment to Plaintiffs and awarded statutory penalties and attorneys' fees and costs. Defendants now appeal those rulings.

Exercising jurisdiction under 28 U.S.C. § 1291, we vacate the grant of summary judgment to Plaintiffs on the Parity Act claim and remand to the district court to dismiss that claim for lack of standing. We reverse in part the district court's grant of summary judgment to Plaintiffs on the ERISA disclosure claim. We otherwise affirm.

**I**

We begin with the factual and procedural background. We then address a threshold jurisdictional question. As we explain, Plaintiffs lacked standing to bring a Parity Act claim. Proceeding to the merits of the issues properly before us, we consider the district court's ruling that Defendants violated ERISA's disclosure requirements under 29 U.S.C. § 1024(b)(4) and review the award of attorneys' fees and costs to Plaintiffs.

**A[1]**

At the time of the events underlying the complaint, M.S. was employed by Defendant Microsoft Corporation (Microsoft). Microsoft offered its employees a health benefits plan under ERISA called the Microsoft Corporation Welfare Plan (the Plan). The Plan provided coverage for "medically necessary" treatments, including "medically necessary treatment for[] mental health."[2] App. I at 95, 109–10.

---

[1] We take the facts from the district court's orders on appeal, the parties' pleadings, and the record on the benefits denial as presented to the district court, and in doing so, we "view the evidence and draw reasonable inferences in the light most favorable to the nonmoving party." *Teets* v. *Great-West Life & Annuity Ins. Co.*, 921 F.3d 1200, 1211 (10th Cir. 2019).

[2] The Plan says "medically necessary" means, among other things, the treatment "is essential to the diagnosis or the treatment of a[] . . . condition that is harmful or threatening to the enrollee's life or health," "appropriate

The Plan named Microsoft as the Plan's administrator and identified a third party, Defendant Premera Blue Cross (Premera), as the Plan's claims administrator. Under this structure, Microsoft had "all powers necessary or appropriate to carry out" the Plan, and Microsoft delegated its claims-processing responsibilities to Premera. App. I at 69, 211. Claims for health insurance coverage were thus reviewed by Premera. If Premera denied a claim, a Plan participant could "appeal for an internal review of the decision." App. I at 100. If Premera denied an internal review appeal, a participant could "request an external review by an independent review organization." App. I at 102. These internal and external review processes were prerequisites to seeking judicial review.

C.S. was a Plan beneficiary. Beginning at the age of five, C.S. received "ongoing behavioral, social, occupational, and language therapies." App. I at 136 ¶ 14 (citation omitted). Eventually, C.S. "was diagnosed with autism spectrum disorder, anxiety, and oppositional defiant disorder." App. I at 139 ¶ 31. C.S. needed supportive therapies into his teenage years, and in 2016, his parents explored residential programs. In August 2017, C.S. enrolled at

---

for the medical condition as specified in accordance with authoritative medical or scientific literature and generally accepted standards of medical practice," and "cost-effective." App. I at 111.

Daniels Academy, a residential treatment center in Utah. On September 6, 2017, Plaintiffs submitted a claim to Premera, seeking coverage under the Plan for C.S.'s treatments at Daniels Academy.

Two days later, Premera denied the claim. Premera concluded C.S.'s residential treatment at Daniels Academy was not "medically necessary based on accepted medical standards" and was not "needed to prevent, diagnose or treat an illness, injury, condition or disease." App. III at 525. In the denial letter, Premera identified the sources it relied on in making its decision, which included the Plan, C.S.'s medical records from Daniels Academy, and the "McKesson InterQual Criteria, BH: Child and Adolescent Psychiatry InterQual 2017" (the InterQual Criteria).[3] App. III at 525. According to Premera's review, the "intensity of C.S.'s symptoms" and the "intensity of treatment" at Daniels Academy "did not meet the InterQual Criteria for a residential treatment center." App. I at 218–19.

Plaintiffs pursued an internal administrative appeal of Premera's denial. In Plaintiffs' view, C.S.'s residential treatment at Daniels Academy was

---

[3] The InterQual Criteria are a set of guidelines for evaluating the "medical appropriateness of healthcare services." App. III at 588. The criteria are "derived from the systematic, continuous review and critical appraisal of the most current evidence-based literature and include input from [an] independent panel of clinical experts." App. III at 588–89.

"absolutely medically necessary." App. III at 472. And Premera's use of the InterQual Criteria to deny coverage, Plaintiff contended, was "a violation of [the Plan] terms and provisions." App. I at 220 (alteration in original) (citation omitted). Plaintiffs requested "a copy of all the documents" Premera used to evaluate C.S.'s claim, including "any administrative services agreements" and "any mental health and substance use disorder treatment criteria." App. III at 493. In describing "mental health and substance use disorder treatment criteria," Plaintiffs specifically requested criteria used to evaluate claims for treatments at "skilled nursing facilit[ies]." App. III. at 493.

Premera sent Plaintiffs' internal appeal to an independent psychiatrist for review. "Based on the clinical information provided and the plan definition of medically necessary," the psychiatrist determined C.S.'s stay at Daniels Academy "would not be considered medically necessary for this patient."[4]

---

[4] Recall, the Plan set forth a list of considerations used to determine whether a treatment is medically necessary. These considerations include whether the treatment is "essential to the diagnosis or the treatment of a[] . . . condition that is harmful or threatening to the enrollee's life or health," "appropriate for the medical condition as specified in accordance with authoritative medical or scientific literature and generally accepted standards of medical practice," and "cost-effective." App. I at 111. Here, the independent psychiatrist found C.S. "could have still received safe and appropriate treatment" outside a residential treatment center, making his stay at Daniels Academy non-essential; the use of a residential treatment center exceeded what was required by the standard of care; and C.S.'s stay

App. III at 528–29. Premera upheld the denial, agreeing C.S.'s stay at Daniels Academy was "not medically necessary." App. III at 469. Premera explained "[t]he available information indicates that the patient's symptoms were not of a severity to require the use of residential treatment, and he could have been treated safely and effectively in a less intensive setting." App. III at 469. In response to Plaintiffs' request for documents used to evaluate C.S.'s claim, Premera produced copies of the Plan and the InterQual Criteria. Premera did not provide "any administrative services agreements," as Plaintiffs requested.[5] App. I at 222. Nor did they initially provide copies of "skilled nursing facility" criteria. *See* App. I at 222.

Plaintiffs next pursued an external review of the denial with an independent review organization. As part of that process, Plaintiffs "again requested production of the documents they sought in their [initial] Appeal letter." App. I at 224. The independent review organization upheld Premera's

---

"was not the most cost-effective treatment that could have been effectively and safely utilized." App. III at 529–30.

[5] The parties do not provide a definition of an administrative services agreement. However, they—and the district court—identify the agreement between Microsoft and Premera as one example. That agreement is the "contract between Premera and Microsoft primarily intended to memorialize the amount Microsoft pays Premera to administer the plan and the services Microsoft purchased from Premera." Reply Br. at 18. We discuss this administrative services agreement in more detail in Part III.A.

decision. It found C.S.'s stay at Daniels Academy was not medically necessary, explaining C.S. "had no objective noted, current mental problems that would have needed 24 hour care." App. III at 541. Despite Plaintiffs' requests, Premera declined to disclose any administrative service agreements or skilled nursing facility criteria.

**B**

Plaintiffs sued Premera, Microsoft, and the Plan in federal court in the District of Utah. They claimed Defendants (1) failed to provide coverage for C.S.'s medically necessary treatment in violation of the Plan, entitling Plaintiffs to benefits under 29 U.S.C. § 1132(a)(1)(B) (the ERISA benefits claim); (2) evaluated claims for mental health care more stringently than claims for other medical treatments in violation of the Parity Act, 29 U.S.C. §§ 1185a, 1132(a)(3) (the Parity Act claim); and (3) failed to produce documents under which the Plan was established or operated, in violation of ERISA's disclosure requirements under 29 U.S.C. § 1132(a)(1)(A), (c) (the ERISA disclosure claim). Plaintiffs requested "[j]udgment in the total amount that is owed for" C.S.'s stay at Daniels Academy, "[a]ppropriate equitable relief," statutory penalties, and attorneys' fees and costs. App. I at 36–37.

9

**1**

The parties filed cross motions for summary judgment. Defendants sought summary judgment on all claims. They maintained the evidence supported Premera's determination that C.S.'s stay at Daniels Academy was not medically necessary, and therefore, Plaintiffs could not recover benefits under ERISA. They also insisted Premera's evaluation of C.S.'s claim did not violate the Parity Act and that Defendants "fully complied with the ERISA's document production requirements." App. I at 89.

Plaintiffs moved for summary judgment in their favor. First, Plaintiffs claimed entitlement to benefits under ERISA because "the medical records clearly demonstrate" C.S.'s treatment at Daniels Academy was medically necessary. App. I at 161. Plaintiffs requested payment from Defendants for C.S.'s treatment at Daniels Academy.

Second, as for their Parity Act claim, Plaintiffs insisted Defendants used "additional criteria beyond the terms of the Plan—the InterQual criteria—to [evaluate] claims for mental health treatment at a residential treatment facility." App. I at 166. But Defendants did not use "any separately developed criteria, whether InterQual or otherwise," to evaluate claims for non-mental health related inpatient treatments. App. I at 166–67. In Plaintiffs' view, these differing evaluation methods resulted in

more stringent evaluation of claims for residential mental health treatment than for "analogous" treatments unrelated to mental health, and thus violated the Parity Act. For the alleged Parity Act claim, Plaintiffs requested "equitable relief in the form of an injunction, specific performance, disgorgement, restitution, surcharge, or some combination of those remedies." App. at 171 (footnotes omitted).

Third, Plaintiffs contended Defendants violated ERISA disclosure requirements by failing to produce the administrative services agreement between Microsoft and Premera, or the criteria used to evaluate claims at skilled nursing facilities. Plaintiffs sought statutory penalties for the alleged disclosure violation.

**2**

In August 2021, the district court resolved the parties' cross-motions for summary judgment (the Summary Judgment Order). The Summary Judgment Order proceeded in four parts. First, the district court granted summary judgment for Defendants on the ERISA benefits claim. According to the district court, the evidence did not "demonstrate the medical necessity of C.S.'s . . . treatment at Daniels Academy" under either "the InterQual Criteria or the language of the Plan." App. I at 242.

Second, the district court granted summary judgment to Plaintiff on the Parity Act claim. The district court explained, based on the summary judgment record, "the additional InterQual criteria are applied to determine whether residential treatment center benefits are medically necessary." App. I at 251. Defendants "applied more restrictive[]" criteria to evaluate residential mental health benefits, the district court determined, than the criteria "applied to analogous medical/surgical benefits covered by the Plan." Act. App. I at 251. But "the appropriate remedy for a Parity Act violation" was not clear. App. I at 251. The district court ordered supplemental briefing on the issue.

Third, the district court granted summary judgment to Plaintiffs on their ERISA disclosure claim. "Defendants did not produce the . . . skilled nursing" criteria Plaintiffs requested until the parties engaged in discovery, and Defendants "never produced" the administrative services agreement between Microsoft and Premera, the court observed. App. I at 253. "[I]nstead of fulfilling their obligation to disclose the requested documents under [ERISA]," the district court reasoned, "Defendants forced the Family to repeatedly fight for access to the documents for over three years." App. I at 261. According to the district court, "Defendants failed to satisfy their disclosure obligations and in doing so interfered with the Family's ability to

understand and protect their rights under ERISA." App. I at 264. For this violation, the district court imposed a statutory penalty of $100 per day, under 29 U.S.C. § 1132(c), resulting in a total penalty of $123,100.

**3**

After the Summary Judgment Order entered, the parties submitted supplemental briefing on the appropriate remedy for Defendants' Parity Act violation. Plaintiffs stated "the Court has effectively already provided Plaintiffs with declaratory relief by holding . . . Defendants' conduct violated [the Parity Act]." App. I at 270. But they still sought injunctive relief, specific performance, surcharge, disgorgement, and equitable restitution.[6]

Plaintiffs also moved for attorneys' fees and costs under 29 U.S.C. § 1132(g)(1). Under that provision, in an action brought "by a

---

[6] Plaintiffs asserted "the Court should enjoin Defendants from continuing to violate [the Parity Act] by applying the InterQual Criteria in addition to the Plan's terms." App. I at 272. As to specific performance, they maintained the district court should require Defendants to reevaluate C.S.'s claim for his treatment at Daniels Academy "using only the terms of the Plan, without applying the InterQual Criteria." App. I at 274. And they were entitled to a $217,757 in surcharge, they insisted, reflecting the amounts Plaintiffs paid to provide for C.S.'s treatment and appeal Defendants' claims denial. Plaintiffs also requested Defendants "disgorge" the "improper gains" they received from the Parity Act violation and restitution for the amount Plaintiffs spent on C.S.'s treatment. App. I at 276.

participant, beneficiary, or fiduciary" of a plan regulated under ERISA, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." *Id.* A claimant can recover fees under the statute "as long as the fee claimant has achieved 'some degree of success on the merits.'" *Cardoza* v. *United of Omaha Life Ins. Co.*, 708 F.3d 1196, 1207 (10th Cir. 2013) (quoting *Hardt* v. *Reliance Standard Life Ins. Co.*, 560 U.S. 242, 255 (2010)). Plaintiffs contended that success on their Parity Act and ERISA disclosure claims at summary judgment entitled them to fees and costs under the statute. They sought $69,240 in attorneys' fees and $400 in costs.

Defendants maintained "Plaintiffs are not entitled to any remedy for the Court's Parity Act violation finding." App. I at 289. As to Plaintiffs' motion for attorneys' fees, Defendants filed a response explaining they did "not challenge Plaintiffs' recovery of an award of $69,240 in attorney fees and $400 in costs as requested in their Motion." Supp. App. at 105. But they "reserve[d] their rights to appeal the underlying orders and therefore on that basis to appeal the award of fees and costs or interest." Supp. App. at 105.

In June 2022, the district court issued an order ruling on the appropriate remedy for Defendants' Parity Act violation (the Remedies

14

Order). The district court reasoned "Plaintiffs have not tethered the requested . . . relief to harm incurred due to Defendants' Parity Act violation or demonstrated how the relief sought would remedy any such harm." App. II at 310. Addressing each requested remedy in turn, the district court agreed with Defendants that Plaintiffs were not entitled to the relief they requested in their supplemental briefing.[7]

First, the district court concluded Plaintiffs lacked standing to obtain injunctive relief. "To have standing to seek prospective injunctive relief," the court explained, "the plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future." App. II at 302 (quoting *Colo. Cross Disability Coal.* v. *Abercrombie & Fitch Co.*,

---

[7] In the Remedies Order, the district court held "Plaintiffs are not entitled to any *additional* remedy for Defendants' Parity Act violation." App. II at 299 (emphasis added). It thus appears the district court agreed with Plaintiffs that "the Court has effectively already provided Plaintiffs with declaratory relief by holding, in its [Summary Judgment Order], that Defendants' conduct violated [the Parity Act]." App. I at 270.

As we explain, Plaintiffs lacked standing to pursue their Parity Act claim, so the district court lacked jurisdiction to grant Plaintiffs any form of relief on that claim—declaratory or otherwise. *See Shields L. Grp., LLC* v. *Stueve Siegel Hanson LLP*, 95 F.4th 1251, 1279 (10th Cir. 2024) ("[A] challenge to standing presents the threshold jurisdictional question of whether a court may consider the merits of a dispute." (internal quotation marks omitted) (quoting *Tennile* v. *W. Union Co.*, 809 F.3d 555, 559 (10th Cir. 2015))). Thus, despite the district court's framing, the issue before us is one of standing, not remedy.

15

765 F.3d 1205, 1211 (10th Cir. 2014)). Here, the court reasoned, "Plaintiffs have failed to demonstrate that, absent an injunction, they face a continued or repeat threat of actual or imminent injury" from the Parity Act violation. App. II at 303.

Specific performance—to have Defendants reevaluate C.S.'s claims for his stay at Daniels Academy *without* relying on the InterQual Criteria—was also unavailable. The district court reasoned that, even if Defendants reevaluated the claim, "[i]t appears from the record that" Defendants would still deny it "for lack of medical necessity." App. II at 304. During both the internal review process and the appeal to an independent review organization, the reviewers found—without relying on the InterQual Criteria—C.S.'s stay at Daniels Academy was not medically necessary. "At bottom," the district court determined, Plaintiffs' "request for specific performance suffers a failure of proof" because Plaintiffs "ha[ve] not demonstrated that the requested specific performance would rectify a suffered harm." App. II at 307.

The court likewise rejected Plaintiffs' requests for surcharge, disgorgement, and restitution. "[E]ach of these . . . remedies requires a loss, ill-gotten gain, or transfer traceable to Defendants' wrongdoing," the court explained. App. II at 309. "Here, because . . . residential treatment care [for

16

C.S.] was not deemed medically necessary under the Plan's terms, even without application of the InterQual Criteria, Defendants' Parity Act violation did not result in Plaintiffs' monetary loss or Defendants' ill-gotten gain." App. II at 309–10. As with the "request for specific performance, Plaintiffs' request for surcharge, disgorgement, or restitution suffers a failure of proof." App. II at 310.

In the Remedies Order, the district court also granted Plaintiffs' motion for attorneys' fees, under 29 U.S.C. § 1132(g)(1), and awarded the full amounts requested, $69,240 in attorneys' fees and $400 in costs. Final judgment was entered for Defendant on the ERISA benefits claim and for Plaintiffs on the Parity Act and ERISA disclosure claims. Defendants timely appealed.

## II

Defendants urge reversal, contending the district court erroneously granted summary judgment to Plaintiffs on the Parity Act and ERISA disclosure claims. On that basis, Defendants also challenge the award of attorneys' fees and costs. Before we turn to the merits, we must first address a threshold jurisdictional issue. "Absent an assurance that jurisdiction exists, a court may not proceed in a case." *Chieftain Royalty Co.* v. *SM Energy Co.*, 100 F.4th 1147, 1161 (10th Cir. 2024) (citing *Cunningham* v.

*BHP Petrol. Gr. Brit. PLC*, 427 F.3d 1238, 1245 (10th Cir. 2005)); *see also Citizens Concerned for Separation of Church & State* v. *City & Cnty. of Denver*, 628 F.2d 1289, 1301 (10th Cir. 1980) ("A federal court must in every case, and at every stage of the proceeding, satisfy itself as to its own jurisdiction . . . ."). The record in this case prompted us to ask whether Plaintiffs had Article III standing to pursue their Parity Act claim. The answer is no. As we will explain, we must vacate the district court's grant of summary judgment to Plaintiffs on the Parity Act claim.[8]

**A**

Congress passed the Parity Act "to end discrimination in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans." *E.W.* v. *Health Net Life Ins. Co.*, 86 F.4th 1265, 1280 (10th Cir. 2023) (quoting *Am. Psychiatric Ass'n* v. *Anthem Health Plans, Inc.*, 821 F.3d 352, 356 (2d Cir. 2016)). The statute requires employer-sponsored group health plans to ensure treatment limitations for mental health benefits "are no more restrictive than the predominant treatment limitations applied to substantially all medical and

---

[8] Because we vacate the district court's ruling on the Parity Act claim, we do not reach the merits of Defendants' appeal on that issue.

surgical benefits covered by the plan . . . and there are no separate treatment limitations that are applicable only . . . to mental health . . . benefits." 29 U.S.C. § 1185a(a)(3)(A)(ii). A "'treatment limitation' includes limits on the frequency of treatment, number of visits, days of coverage, or other similar limits on the scope or duration of treatment." *Id.* § 1185a(a)(3)(B)(iii). The requirements of the Parity Act are incorporated into ERISA, so plan beneficiaries may invoke ERISA's civil-enforcement provision, 29 U.S.C. § 1132(a), to enforce their Parity Act rights. *See E.W.*, 86 F.4th at 1280 (explaining the Parity Act "is an amendment to ERISA"); 29 U.S.C. § 1132(a)(3) (allowing a beneficiary to seek injunctive and equitable remedies for violations of "any provision of this subchapter or the terms of the plan").

Recall, in the Summary Judgment Order, the district court found Defendants violated the Parity Act by using InterQual Criteria to assess residential mental health treatment claims, but not to review analogous non-mental health medical claims. Defendants insist their "[u]se of the InterQual Criteria for residential treatment centers but not for [certain inpatient non-mental health treatments] does not ipso facto mean that Premera violated the Parity Act." Opening Br. at 34. The district court's contrary holding, Defendants maintain, requires reversal.

19

After this appeal was briefed, but before oral argument, we identified a threshold jurisdictional issue concerning the Parity Act claim. In the Remedies Order—which Plaintiffs do not appeal—the district court held that Plaintiffs' alleged loss of benefits for C.S.'s residential treatment was not caused by the Parity Act violation. The district court framed its inquiry in terms of what *remedies* were available to Plaintiffs, apparently assuming Plaintiffs had standing to pursue some form of relief for the Parity Act violation. "'[A] plaintiff must demonstrate standing for each claim he seeks to press' and 'for each form of relief' that is sought." *Davis* v. *Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *DaimlerChysler Corp.* v. *Cuno*, 547 U.S. 332, 352 (2006)). Under these circumstances, we asked the parties to address whether Plaintiffs have Article III standing to assert their claim that Defendants violated the Parity Act.

"The requirement that a plaintiff have standing 'is grounded in Article III of the U.S. Constitution, which restricts federal court adjudication to actual cases or controversies.'" *Utah Ass'n of Cntys.* v. *Bush*, 455 F.3d 1094, 1098 (10th Cir. 2006) (quoting *Utah* v. *Babbitt*, 137 F.3d 1193, 1201 (10th Cir. 1998)). "The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" *United States* v. *Hays*,

20

515 U.S. 737, 742 (1995) (alteration in original) (quoting *FW/PBS, Inc.* v. *Dallas*, 493 U.S. 215, 230–31 (1990)). Thus, "[w]hether or not raised by the parties, we are obligated to satisfy ourselves as to our own jurisdiction at every stage of the proceeding." *Alexander* v. *Anheuser-Busch Cos., Inc.*, 990 F.2d 536, 538 (10th Cir. 1993); *see also Jordan* v. *Sosa*, 654 F.3d 1012, 1019 (10th Cir. 2011) ("Although the parties and the district court neglected to address whether [plaintiff] had standing . . . , we raise the issue *sua sponte* '[b]ecause it involves the court's power to entertain the suit.'" (last alteration in original) (quoting *Green* v. *Haskell Cnty. Bd. of Comm'rs*, 568 F.3d 784, 792 (10th Cir. 2009))); *Niemi* v. *Lasshofer*, 770 F.3d 1331, 1345 (10th Cir. 2014) ("[T]he question of subject-matter jurisdiction can be raised at any time.").

"The standing inquiry ensures that a plaintiff has a sufficient personal stake in a dispute to ensure the existence of a live case or controversy which renders judicial resolution appropriate." *Tandy* v. *City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004). A plaintiff bears the burden of establishing Article III standing by showing (1) they have suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) the injury is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) the injury is likely to "be redressed by a favorable

21

decision" by the court. *Lujan* v. *Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (alterations in original) (quoting *Whitmore* v. *Arkansas*, 495 U.S. 149, 155 (1990); *Simon* v. *E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 41 (1976)).

"It is axiomatic that standing is evaluated as of the time a case is filed." *Rio Grande Found.* v. *Oliver*, 57 F.4th 1147, 1161 (10th Cir. 2023). Though "[s]tanding is determined as of the time the action is brought," *Jordan*, 654 F.3d at 1019 (quoting *Bush*, 455 F.3d at 1099)), "the proof required to establish standing increases as the suit proceeds," *Davis*, 554 U.S. at 734. The standing inquiry thus looks to "whether [plaintiffs] had a personal stake in a case or controversy at the time they filed their complaint, in light of all the evidence we now have." *Rio Grande Found.*, 57 F.4th at 1162.

B

With these principles in mind, we proceed to the task before us: determining whether Plaintiffs have shown that, when they brought their Parity Act claim, they (1) suffered an injury in fact that was (2) traceable to Defendants and (3) redressable by a favorable decision. *See Lujan*, 504 U.S. at 560–61. "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561.

22

In their supplemental briefing on appeal, Plaintiffs insist there is no jurisdictional problem. Defendants agree Plaintiffs have standing but contend the Parity Act claim is moot. As we will explain, the issue here concerns standing, not mootness.[9] The parties identify two potential injuries that could confer Article III standing for Plaintiffs to pursue their Parity Act claim: Plaintiffs were denied benefits under the Plan and deprived of notice of how Defendants review claims. Neither is sufficient to satisfy the requirements of Article III.

**1**

We first consider whether Plaintiffs suffered an injury in fact when Plaintiffs were denied benefits for C.S.'s treatment at Daniels Academy. We agree the denial of healthcare benefits is a "concrete and particularized injury" for purposes of establishing Article III standing. *See Rio Grande Found.*, 57 F.4th at 1160 (quoting *Carney* v. *Adams*, 592 U.S. 53, 58 (2020)). But this alleged injury, on the record before us, is not *traceable* to Defendants' Parity Act violation. "To satisfy the traceability requirement, the defendant's conduct must have caused the injury." *Benham* v. *Ozark Materials River Rock, LLC*, 885 F.3d 1267, 1273 (10th Cir. 2018).

---

[9] *See infra*, n.10.

23

The district court found Defendants violated the Parity Act by applying the InterQual Criteria when determining whether residential mental health treatments were medically necessary, but "us[ing] only the Plan language to determine [the] medical necessity" of analogous non-mental health treatments. App. II at 298. But in its Summary Judgment order, the district court found Plaintiffs failed to "demonstrate the medical necessity of C.S.'s . . . treatment at Daniels Academy *under the . . . language of the Plan.*" App. I at 242 (emphasis added). And in the Remedies Order, the district court reiterated C.S.'s treatment at Daniels Academy was "not covered *under the Plan terms.*" App. II at 309 (emphasis added). "[E]ven without application of the InterQual Criteria," the district court reasoned, Defendants would have denied the benefits claim. App. II at 309. This finding—that Plaintiffs would have been denied benefits under the terms of the Plan, even without application of the InterQual Criteria— is unchallenged. Defendants agree with the district court's determination that "any violation of the Parity Act did not cause the loss of benefits." Defs.' Supp. Br. at 7 (contending the district court "lacked jurisdiction to address

the Parity Act [claim] at all").[10] And Plaintiffs have not appealed. We therefore accept the district court's finding that Plaintiffs still would have suffered an alleged injury—the denial of benefits—even if Defendants had

---

[10] In Defendants' view, the lack of causation presents a problem of mootness. They posit Plaintiffs "had standing at the outset of the case, because they *alleged* an injury (the failure to receive benefits) that was purportedly caused by the Parity Act violation." Defs.' Supp. Br. at 6. The district court only "lost Article III jurisdiction," they maintain, when the district court ruled on the lack of causation. Defs.' Supp. Br. at 6. This argument misunderstands the doctrines of standing and mootness.

"The doctrine of mootness ensures that a case or controversy exists throughout the proceedings." *Rio Grande Found.* v. *Oliver*, 57 F.4th 1147, 1165 (10th Cir. 2023). While "[s]tanding concerns whether a plaintiff's action qualifies as a case or controversy when it is filed," "mootness ensures it remains one at the time a court renders its decision." *Id.* at 1160 (quoting *Brown* v. *Buhman*, 822 F.3d 1151, 1163 (10th Cir. 2016)). "[A] case properly brought in the first instance only becomes moot where 'interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" *Bldg. & Const. Dep't* v. *Rockwell Int'l Corp.*, 7 F.3d 1487, 1491 (10th Cir. 1993) (quoting *Cnty. of L.A.* v. *Davis*, 440 U.S. 625, 631 (1979)).

Here, the Parity Act violation was not traceable to Plaintiffs' denial of benefits injury *at the time Plaintiffs filed their complaint. See Utah Animal Rights Coal.* v. *Salt Lake City Corp.*, 371 F.3d 1248, 1263 (10th Cir. 2004) (McConnell, J., concurring) ("Standing doctrine addresses whether, at the inception of the litigation, the plaintiff had suffered a concrete injury that could be redressed by action of the court."). The jurisdictional issue before us thus pertains to standing, not mootness. That the district court did not make its causation finding until the summary judgment phase of the litigation does not change our conclusion. *See Gladstone, Realtors* v. *Vill. of Bellwood*, 441 U.S. 91, 115 n.31 (1979) ("[I]t sometimes remains to be seen whether the factual allegations of the complaint necessary for standing will be supported adequately by the evidence adduced at trial.").

not violated the Parity Act. Plaintiffs have thus failed to demonstrate that the denial of benefits is "fairly traceable to the challenged action of the defendant." *Benham,* 885 F.3d at 1272 (quoting *Friends of the Earth, Inc.* v. *Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). Accordingly, Plaintiffs have not shown standing to bring their Parity Act claim based on a denial-of-benefits injury.[11]

**2**

We next consider whether Plaintiffs have demonstrated standing "because Premera did not provide them *notice*" that Defendants evaluate residential mental health treatment claims differently from comparable non-mental health treatment claims. Pls.' Supp. Br. at 2 (emphasis added). "Because Defendants were required to provide notice of the Plan's terms and claim review procedures," they maintain, "Plaintiffs were injured when Defendants did not provide notice of the facial disparity in the Plan's treatment" of these types of claims. Pls.' Supp. Br. at 3. We are not persuaded.

---

[11] Because Plaintiffs have not demonstrated they satisfy the traceability requirement, we need not address the redressability requirement. *See Lujan* v. *Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (noting the "irreducible constitutional minimum of standing contains three elements").

"[O]ne of ERISA's central goals is to enable plan beneficiaries to learn their rights and obligations at any time." *Member Servs. Life Ins. Co.* v. *Am. Nat'l Bank & Tr. Co. of Sapulpa*, 130 F.3d 950, 956 (10th Cir. 1997) (alteration in original) (quoting *Curtiss-Wright Corp.* v. *Schoonejongen,* 514 U.S. 73, 83 (1995)). It is true ERISA requires plan administrators to disclose details about their claim review procedures to plan participants. For example, "ERISA . . . provides that a claim denial notice shall contain a 'description of the plan's review procedures.'" *Holmes* v. *Colo. Coal. for Homeless Long Term Disability Plan*, 762 F.3d 1195, 1208 (10th Cir. 2014) (quoting 29 C.F.R. § 2560.503-1(g)(1)(iv)). But even assuming—without deciding—Defendants did not provide proper notice of the claim review procedures, Plaintiffs have failed to demonstrate this deprivation satisfies Article III.

Plaintiffs cite no authority suggesting a lack of notice of claim review procedures in violation of ERISA is, without more, an injury in fact. Nor are we aware of any. Indeed, "we have excused deviations from ERISA's notice requirements so long as the claimant has not been prejudiced thereby." *Id.* at 1211 (citing cases). Here, Plaintiffs have identified no specific notice requirement allegedly violated by Defendants or otherwise shown prejudice from any such violation. It is Plaintiffs' burden to show they satisfy the

27

requirements for Article III standing. *See Lujan*, 504 U.S. at 561. Without more, we cannot conclude Plaintiffs sustained an injury in fact because they received no notice of Defendants' claim review procedures.[12]

Plaintiffs have not demonstrated how they have been concretely harmed by Defendants' Parity Act violation. *See Laufer* v. *Looper*, 22 F.4th 871, 877 (10th Cir. 2022) ("Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to

---

[12] While unclear, another argument Plaintiffs seem to raise is they suffered an injury in fact simply by having undergone "a discriminatory review process" by virtue of Defendants applying the InterQual Criteria to residential mental health treatment claims but not other analogous claims. *See* Pls.' Supp. Br. at 7. This argument would suggest the mere existence of a Parity Act violation is an injury in fact. Plaintiffs do not cite any law in support of such a proposition. This is unsurprising.

"Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc.* v. *Robins*, 578 U.S. 330, 341 (2016). This principle applies even where, as here, Congress has created a private right of action for the violation of a federal statute. *See id.* (explaining "a plaintiff [does not] automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right"); *TransUnion LLC* v. *Ramirez*, 594 U.S. 413, 427 (2021) ("Congress may create causes of action for plaintiffs to sue defendants who violate those legal prohibitions or obligations[,] [b]ut under Article III, an injury in law is not an injury in fact."). "Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *TransUnion*, 594 U.S. at 427. As we have explained, Plaintiffs do not point us to any such concrete harm. On the record before us, we are thus unable to conclude Plaintiffs have suffered an injury in fact with respect to their Parity Act claim.

hold defendants accountable for legal infractions." (quoting *TransUnion LLC* v. *Ramirez*, 594 U.S. 413, 427 (2021))). We thus conclude Plaintiffs lacked standing to bring their Parity Act claim. "An essential component of a Case or Controversy is that the party bringing the action have standing." *Utah Physicians for a Healthy Env't* v. *Diesel Power Gear, LLC*, 21 F.4th 1229, 1241 (10th Cir. 2021). Without it, the district court was without jurisdiction to hear Plaintiffs' Parity Act claim. "And if the record discloses that the lower court was without jurisdiction," the appellate court has "jurisdiction on appeal, not of the merits but merely for the purpose of correcting the error of the lower court in entertaining the suit." *Bender* v. *Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) (quoting *United States* v. *Corrick*, 298 U.S. 435, 440 (1936)). We therefore vacate the district court's grant of summary judgment on the Parity Act claim and remand with instructions to dismiss that claim for lack of jurisdiction.

## III

We turn now to the merits of Defendants' appeal. Defendants ask us to reverse the district court's grant of summary judgment on Plaintiffs' ERISA disclosure claim. They also challenge the district court's award of attorneys' fees and costs under 29 U.S.C. § 1132(g)(1). We affirm in part

29

and reverse in part the ruling on the ERISA disclosure claim, and we affirm the award of attorneys' fees and costs.

## A

We first consider Defendants' challenge to the district court's grant of summary judgment in Plaintiffs' favor on the ERISA disclosure claim. We review *de novo* a district court's rulings on cross-motions for summary judgment. *D.K.* v. *United Behav. Health*, 67 F.4th 1224, 1235 (10th Cir. 2023); *see also Allen* v. *Sybase, Inc.*, 468 F.3d 642, 649 (10th Cir. 2006).

Under 29 U.S.C. § 1024(b)(4), a plan administrator "shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." This provision allows plan "beneficiaries to learn their rights and obligations at any time," *Lyn M.* v. *Premera Blue Cross*, 966 F.3d 1061, 1065 (10th Cir. 2020) (quoting *Curtiss-Wright Corp.*, 514 U.S. at 83), and puts them "in a position to make informed decisions about how best to protect their rights." *Moothart* v. *Bell*, 21 F.3d 1499, 1503 (10th Cir. 1994).

Failure to comply with the disclosure requirements of 29 U.S.C. § 1024(b)(4) carries consequences for plan administrators. ERISA creates a

private right of action for "a participant or beneficiary" if a plan administrator "fails or refuses to comply with a request for any information which such administrator is required . . . to furnish" under § 1024(b). 29 U.S.C. § 1132(a)(1)(A), (c)(1)(B). If the plan administrator does not comply with the request within thirty days, "a court may award damages 'up to $100 a day from the date of such failure or refusal' and 'other relief as [the court] deems proper.'" *E.W.*, 86 F.4th at 1291 n.5 (alteration in original) (quoting 29 U.S.C. § 1132(c)(1)). The award of statutory penalties for failing to provide required information is "in the court's discretion." 29 U.S.C. § 1132(c)(1).

In the district court, Plaintiffs claimed a violation under § 1024(b)(4) because Defendants failed to disclose two sets of requested documents: "any administrative services agreements that exist" and "mental health and substance use disorder treatment criteria . . . [for] skilled nursing facilit[ies]." App. I at 169. Defendants conceded they did not produce these documents but insisted they were under no obligation to do so. According to Defendants, "Plaintiffs' requests far exceeded [ERISA's] requirements that the administrator make the governing plan documents available." App. I at 90. In their view, Defendants "fully complied with . . . ERISA's document production requirements" under 29 U.S.C. § 1024(b)(4), and the

31

administrative services agreements and skilled nursing facility criteria were outside the statutory scope. App. I at 89–90.

The district court concluded the requested information—"the Administrative Services Agreement between the Plan Administrator, Microsoft, and the Claims Administrator, Premera" (the ASA) and "the InterQual Criteria for medical/surgical benefits including skilled nursing and inpatient rehabilitation facilities" (the Skilled Nursing InterQual Criteria)—had not been produced and fell within the scope of 29 U.S.C. § 1024(b)(4). App. I at 252–53, 255. For "fail[ing] to satisfy their disclosure obligations" under 29 U.S.C. § 1024(b)(4), Defendants were ordered to pay a total of $123,100—$100 for each day Defendants failed to disclose the requested documents. App. I at 264.

As we explain, the district court correctly held Defendants had to disclose the ASA under 29 U.S.C. § 1024(b)(4). But unlike the district court, we discern no violation under that statute for Defendants' refusal to produce the Skilled Nursing InterQual Criteria.

**1**

We have not yet addressed whether administrative services agreements are within the scope of ERISA's disclosure provision. Acknowledging this open question, the district court concluded "the ASA

falls within the scope of the ERISA disclosure provision" based on "the plain language of the statute and the language of the Plan itself." App. I at 257. Premera and Microsoft each had obligations and responsibilities under the Plan that were relevant to beneficiaries, the district court reasoned, and "the ASA between [them] affects the relationship between the plan participants and the provider." App. I at 258 (internal quotations omitted). The district court concluded the ASA was "necessary for the Family to know exactly where they stand with respect to the plan." App. I at 258 (alterations adopted) (internal quotations omitted). Accordingly, the district court ruled the ASA is a "contract, or other instrument[] under which the plan is . . . operated" within the meaning of § 1024(b)(4). App. I at 258 (alterations in original) (quoting 29 U.S.C. § 1024(b)(4)).

On appeal, Defendants contend the ASA is not subject to disclosure under § 1024(b)(4). Reviewing *de novo*, we disagree.

"When interpreting a statute, our primary task is to determine congressional intent, using traditional tools of statutory interpretation." *Potts* v. *Ctr. for Excellence in Higher Educ., Inc.*, 908 F.3d 610, 613 (10th Cir. 2018) (internal citations and quotations omitted). "We begin with the language of the statute itself." *Id.* In considering the statute's language, we must first determine whether "the language at issue has a plain and

unambiguous meaning with regard to the particular dispute in the case." *Id.* (quoting *Ceco Concrete Constr., LLC* v. *Centennial State Carpenters Pension Tr.*, 821 F.3d 1250, 1258 (10th Cir. 2016)). "If the language is plain and unambiguous, 'our inquiry must cease and the plain meaning of the statute controls.'" *Ceco Concrete Constr.,* 821 F.3d at 1258 (quoting *Nat'l Credit Union Admin. Bd.* v. *Nomura Home Equity Loan, Inc.,* 764 F.3d 1199, 1225 (10th Cir. 2014)); *see also Middlesex Cnty. Sewerage Auth.* v. *Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 13 (1981) ("We look first, of course, to the statutory language . . . . Then we review the legislative history and other traditional aids of statutory interpretation . . . ."). When a statute does not define its terms, we look to the "ordinary, contemporary, common meaning" of the terms "when Congress enacted" the statute. *Food Mktg. Inst.* v. *Argus Leader Media,* 588 U.S. 427, 433–34 (2019) (quoting *Perrin* v. *United States,* 444 U.S. 37, 42 (1979)); *see also Sunnyside Coal Co.* v. *Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab.*, 112 F.4th 902, 910 (10th Cir. 2024) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." (quoting *Perrin*, 444 U.S. at 42)). The "common and ordinary usage" of a term "may be obtained by reference to a dictionary." *Takwi* v. *Garland*, 22 F.4th 1180, 1187 (10th Cir. 2022) (quoting *Off. of*

*Thrift Supervision* v. *Overland Park Fin. Corp. (In re Overland Park Fin. Corp.)*, 236 F.3d 1246, 1252 (10th Cir. 2001)). "[W]e look to a contemporary dictionary to determine the likely intent of the Congress adopting the provision." *Conrad* v. *Phone Directories Co., Inc.*, 58 F.3d 1376, 1381 n.1 (10th Cir. 2009); *see also Wis. Cent. Ltd.* v. *United States*, 585 U.S. 274, 277 (2018) (relying on dictionary definitions from "when Congress adopted the Act" to determine the meaning of statutory terms).

The meaning of this portion of § 1024(b)(4) is an issue of first impression in this circuit.[13] At issue here is the phrase "contract . . . under which the plan is established or operated," which § 1024(b)(4) does not define. 29 U.S.C. § 1024(b)(4).

We first ask: is the ASA a "contract"? We have no trouble concluding it is. The ASA is an agreement between Microsoft and Premera for Premera to act as the claims administrator for the Plan and thus falls squarely within the commonly understood definition of "contract" at the time of

---

[13] We have previously considered the meaning of other portions of 29 U.S.C. § 1024(b)(4). *See, e.g., Moothart* v. *Bell*, 21 F.3d 1499, 1503–04 (10th Cir. 1994) (considering whether letters written by plaintiff constituted a "written request" for information within the meaning of § 1024(b)(4)).

35

ERISA's enactment.[14] *See Contract*, Webster's Third New International Dictionary 494 (1976) (defining "contract" as "an agreement between two or more persons or parties to do or not to do something"); *Contract*, Black's Law Dictionary 394 (4th ed. 1968) (defining "contract" as a "promissory agreement between two or more persons that creates, modifies, or destroys a legal relation"). Indeed, the district court concluded as much, App. I at 258, and Defendants admit the ASA "is a contract between Premera and Microsoft," Opening Br. at 36.

We next ask: is the ASA a contract *"under which the plan is established or operated"*? 29 U.S.C. § 1024(b)(4) (emphasis added). Again, we answer yes. The commonly understood meaning of the word "establish" at ERISA's enactment was "to settle or fix after consideration or by enactment or agreement." *Establish*, Webster's Third New International Dictionary 778 (1976); *see also Establish*, Black's Law Dictionary 642–43 (4th ed. 1968) (defining "establish" as "to found, to create, to regulate"). And the term "operate" meant "to . . . exert power or influence: produce an effect." *Operate*, Webster's Third New International Dictionary 1580 (1976);

---

[14] Defendants did not produce the ASA during litigation and the full ASA is not part of the record on appeal, but these omissions do not affect our analysis.

*see also Operate*, Black's Law Dictionary 984 (5th ed. 1979) (defining "operate" as "[t]o perform a function, or operation, or produce an effect"). Thus, the clear and unambiguous meaning of the phrase "under which the plan is established or operated" includes the ASA.

Here, the Plan is both "established and operated" under the ASA. *See* 29 U.S.C. § 1024(b)(4). The ASA creates the system requiring Plan beneficiaries to submit benefits claims to Premera (rather than Microsoft directly), thus "establish[ing]" the Plan for beneficiaries. *Id.* Defendants admit as much, describing the ASA as "a contract . . . that sets forth, among other things, the amount Microsoft will pay Premera and their respective roles." *See* Opening Br. at 36. And the Plan "operate[s]" according to the terms of Premera's administration, as delegated by Microsoft to Premera in the ASA. Because the ASA settles the relationship between Microsoft, Premera, and the Plan, the ASA falls within the plain meaning of § 1024(b)(4)'s disclosure requirements.

We therefore find the language of § 1024(b)(4) has a "plain and unambiguous meaning with regard to the particular dispute in the case." *Potts*, 908 F.3d at 613 (quoting *Ceco Concrete Constr.*, 821 F.3d at 1258); *see also Faircloth* v. *Lundy Packing Co.*, 91 F.3d 648, 653 (4th Cir. 1996) (holding "the statutory language 'other instruments under which the plan

37

is established or operated' is clear and unambiguous" (quoting 29 U.S.C. § 1024(b)(4))). The plain meaning of the statute thus controls, and we need not "turn to other sources to find its meaning." *Nomura Home Equity Loan, Inc.*, 764 F.3d at 1225 (quoting *S. Utah Wilderness All.* v. *Off. of Surface Mining Reclamation & Enf't*, 620 F.3d 1227, 1237–38 (10th Cir. 2010)).

Our conclusion that the ASA falls within the scope of § 1024 is consistent with *Mondry* v. *Am. Fam. Mut. Ins. Co.*, 557 F.3d 781 (7th Cir. 2009), which the district court found persuasive. There, the Seventh Circuit concluded a claims administrator's administrative services agreement with an employer qualified as a "contract . . . under which the plan is established or operated" within the scope of § 1024(b)(4). *Id.* at 795–96. Like here, the administrative services agreement in *Mondry* "identified the respective authority and obligations of [the employer] and [the claims administrator] with respect to the plan." *Id.* at 796. The Seventh Circuit recognized the agreement at issue "did not define what rights or benefits were available to the Plan's participants and beneficiaries." *Id.* (internal quotation marks and citation omitted). Even so, the court determined "the agreement nonetheless governs the operation of the Plan in the sense that it defines the respective roles of [the employer] and [the administrator]." *Id.* "In that

38

respect," the Seventh Circuit held, "it qualifies as a contract under which the plan was operated" under § 1024(b)(4). *Id.*

Defendants unsuccessfully try to distinguish this case from *Mondry*.[15] "In *Mondry*," Defendants explain, "the employer itself was an insurance company . . . and retained some administrative duties." Opening Br. at 42. Plan participants thus "need[ed] to know" the "extent of each administrator's authority." Opening Br. at 42 (quoting *Mondry*, 557 F.3d at 796). In Defendants' view, because "Premera is the only third-party administrator for the health plan[]," this case differs from *Mondry*. Opening

---

[15] Defendants cite out-of-circuit authority and district court cases to support their position that the ASA is outside 29 U.S.C. § 1024(b)(4)'s purview. *See* Opening Br. at 37–41 (citing cases). They maintain the district court "erred when it rejected this precedent." Opening Br. at 41. Of course, neither we nor the district court are bound by out-of-circuit authority or district court orders. *See Brent Elec. Co., Inc.* v. *Int'l Bhd. of Elec. Workers Loc. Union No. 584*, 110 F.4th 1196, 1217 (10th Cir. 2024) (noting "out-of-circuit authority . . . is not binding on us").

Nor do we find persuasive, or particularly instructive, the out-of-circuit authorities cited by Defendants. *See Hively* v. *BBA Aviation Benefit Plan*, 331 F. App'x 510, 511 (9th Cir. 2009) (concluding, in a three-sentence analysis in an unpublished order, "[d]ocuments which relate only to the manner in which the plan is operated are not subject to disclosure under § 1024(b)(4)" (internal quotation marks and citation omitted)); *Fritcher* v. *Health Care Serv. Corp.*, 301 F.3d 811, 817 (7th Cir. 2002) (concluding, without mentioning § 1024(b)(4) and where § 1024(b)(4) was not even at issue, the administrative services agreement "is not a 'plan document' for purposes of holding its terms against a plan participant or beneficiary").

Br. at 42. We disagree. The Seventh Circuit did not find dispositive that the employer also happened to be an insurance company. *See Mondry*, 557 F.3d at 796. Rather, *Mondry* emphasized the administrative services agreement "define[d] the respective roles of [the employer] and [third-party claims administrator]." *Id.* That is precisely what the ASA does. *See* App. III at 583, 586 (ASA listing responsibilities of Microsoft as plan administrator and Premera as claims administrator). Like the district court, we find *Mondry* bears a marked resemblance to the case before us. And like the Seventh Circuit in *Mondry*, we conclude the ASA falls within the scope of § 1024(b)(4).

Defendants' other contrary arguments are likewise unavailing. According to Defendants, "the Supreme Court has held[] one of ERISA's basic purposes is to afford employees the opportunity to inform themselves, 'on examining the plan documents,' of their 'rights and obligations under the plan.'" Opening Br. at 35 (quoting *Curtiss-Wright Corp.*, 514 U.S. at 83). Because the ASA "does not inform employees of their rights and obligations under the Plan," Defendants insist, the ASA "is not a plan document" under the statute. Opening Br. at 35–36. But § 1024(b)(4)'s meaning is unambiguous, so we need not look to the underlying legislative goals of the statute to resolve the issue before us. *See McGirt* v. *Okla.*, 591 U.S. 894, 916

(2020) ("There is no need to consult extratextual sources when the meaning of a statute's terms is clear. Nor may extratextual sources overcome those terms."); *Sunnyside Coal Co*, 112 F.4th at 912 (noting where the text of the statute is clear, "a review of the legislative purpose" of the statute is "unnecessary"). In any event, our textual analysis of § 1024(b)(4) comports with ERISA's purpose as Defendants describe it: "enabl[ing] plan beneficiaries to learn their rights and obligations at any time." *Curtiss-Wright Corp.*, 514 U.S. at 83. Disclosure of the ASA sets out the relationship between Microsoft and Premera, thus better informing beneficiaries of their rights under the Plan and placing them in a position to make informed decisions. *See also Moothart*, 21 F.3d at 1503 ("These sections were included in ERISA so that plan participants and beneficiaries would be in a position to make informed decisions about how best to protect their rights.").

Defendants also urge reversal because the Plan's members are not parties to the ASA, and other Plan documents available to Plaintiffs contained the relevant information found in the ASA. Opening Br. at 36, 42. Again, we must disagree. Nothing in § 1024(b)(4) conditions the disclosure requirement on plan participants being parties to the contract or obviates the disclosure requirement if the information provided in the contract is available elsewhere. *See* 29 U.S.C. § 1024(b)(4).

41

There is no dispute Defendants did not furnish the ASA "within 30 days after" Plaintiffs requested it. 29 U.S.C. § 1132(c)(1). And we agree with the district court that Defendants violated § 1024(b)(4)'s disclosure requirements by failing to produce the ASA.

**2**

We next consider Defendants' argument that the district court erred in requiring disclosure of the Skilled Nursing InterQual Criteria.

In its Summary Judgment Order, the district court reasoned the Skilled Nursing InterQual Criteria were "plainly within the scope of 29 U.S.C. § 1024(b)(4) as 'instruments under which the Plan [was] . . . operated.'" App. I at 253 (omission in original) (quoting 29 U.S.C. § 1024(b)(4)). The district court's conclusion, however, rested on its reading of 29 C.F.R. § 2590.712(d)(3), a regulation under the Parity Act. In interpreting ERISA's broader disclosure requirements, that regulation states

> [i]nstruments under which the plan is established or operated include documents with information on medical necessity criteria for both medical/surgical benefits and mental health and substance abuse disorder benefits, as well as the processes, strategies, evidentiary standards, and other factors used to apply a nonquantitative treatment limitation with respect to medical/surgical benefits and mental health or substance use disorder benefits under the plan.

42

29 C.F.R. § 2590.712(d)(3). The regulation further states beneficiaries may request those same documents "upon appeal of an adverse benefit determination." *Id.* According to the district court, 29 C.F.R. § 2590.712(d)(3) contemplated that evaluation criteria, like the Skilled Nursing InterQual Criteria, would fall within the scope of § 1024(b)(4) to "provide participants with information essential to protecting and making decisions about their rights under ERISA and the Parity Act." App. I at 254.

On appeal, Defendants insist the Skilled Nursing InterQual Criteria are not subject to disclosure under 29 U.S.C. § 1024(b)(4). Opening Br. at 44. Defendants contend the district court "erroneously determined that the Parity Act's implementing regulations" showed the Skilled Nursing InterQual Criteria were "within the scope of 29 U.S.C. § 1024(b)(4)." Opening Br. at 48 (alteration adopted). We agree.[16]

The issue is whether the Skilled Nursing InterQual Criteria are "*other instruments* under which the plan is established or operated." 29 U.S.C. § 1024(b)(4) (emphasis added). Again, we begin with the text of the statute.

---

[16] Because we agree the district court mistakenly relied on the Parity Act regulation, we need not reach Defendants' additional arguments that they did not *actually* rely on the Skilled Nursing InterQual Criteria in denying Plaintiffs' claim and that those criteria are discoverable only under the Federal Rules of Civil Procedure.

43

*Potts*, 908 F.3d at 613. If statutory language is unambiguous, a court's analysis begins and ends with the text. *Id.* We first look to the meaning of the word "instruments" as used in § 1024(b)(4). That term is not defined in the statute, but at the time of ERISA's enactment, "instrument" meant "a legal document (as a deed, will, bond, lease, agreement, mortgage, note, policy, warrant, writ) evidencing legal rights or duties esp. of one party to another." *Instrument*, Webster's Third New International Dictionary 1172 (1976); *see also Instrument*, Black's Law Dictionary (4th ed. 1968) ("A written document; a formal or legal document in writing, such as a contract, deed, will, bond, or lease."). We have no trouble concluding "instruments" in § 1024(b)(4) plainly means legal documents.

With that understanding, we then consider the statutory phrase "*other* instruments." Our analysis invokes familiar canons of statutory interpretation. Under the *ejusdem generis* canon, "[w]here general words follow an enumeration of two or more things," the general words "apply only to persons or things of the same general kind . . . specifically mentioned." *Int'l Bhd. of Elec. Workers, Loc. #111* v. *Pub. Serv. Co. of Colo.*, 773 F.3d 1100, 1108 (10th Cir. 2014) (first alteration in original) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012)). Similarly, under the canon *noscitur a sociis*, "a word

is known by the company it keeps." *Ali* v. *Fed. Bureau of Prisons*, 552 U.S. 214, 226 (2008) (quoting *S.D. Warren Co.* v. *Me. Bd. of Env't Prot.*, 547 U.S. 370, 378 (2006)).

Before referring to "other instruments," § 1024(b)(4) lists legal documents: "annual report[s], . . . terminal report[s], . . . bargaining agreement[s], trust agreement[s], [and] contract[s]" as documents an administrator must disclose. 29 U.S.C. § 1024(b)(4). Applying the principles of *ejusdem generis* and *noscitur a sociis*, § 1024(b)(4)'s use of "other" after a specific list constrains the definition of "instrument" to items sharing the characteristics of the items in that list. *See In re: Motor Fuel Temperature Sales Practs. Litig.*, 872 F.3d 1094, 1105 (10th Cir. 2017) ("[T]he principle of ejusdem generis '[o]rdinarily . . . limits general terms which follow specific ones to matters similar to those specified.'" (second and third alterations in original) (quoting *United States* v. *West*, 671 F.3d 1195, 1200 (10th Cir. 2012))); *United States* v. *Phillips*, 543 F.3d 1197, 1206 (10th Cir. 2008) ("Under the venerable interpretive canons of *noscitur a sociis* and *ejusdem generis*, the meaning of a catchall phrase is given precise content by the specific terms that precede it."). We readily conclude, then, "other instruments" in § 1024(b)(4) means legal documents of the type recited in the preceding list. *See also Shaver* v. *Operating Eng'rs Loc. 428 Pension Tr.*

45

*Fund*, 332 F.3d 1198, 1202 (9th Cir. 2003) (applying *ejusdem generis* principle to § 1024 and concluding "the broad term, 'other instruments,' should be limited to the class of objects that specifically precedes it"). The Skilled Nursing InterQual Criteria do not establish legal rights or duties but are a set of evaluation criteria Defendants may reference depending on the nature of the benefits claim. The Skilled Nursing InterQual Criteria, therefore, are not "other instruments" and need not have been disclosed under the plain meaning of Section 1024(b)(4).

The regulation on which the district court relied certainly seems to contemplate disclosure of the Skilled Nursing InterQual Criteria. *See* 29 C.F.R. § 2590.712(d)(3) (explaining "[i]nstruments under which the plan is established or operated include documents with information on . . . factors used to apply a nonquantitative treatment limitation with respect to medical/surgical benefits"). But we cannot look to the regulation here, where § 1024(b)(4) is unambiguous. Reliance on sources outside a statute's plain text—such as the agency regulation—is inappropriate in the interpretation of an unambiguous statute. *See Kingdomware Techs., Inc.* v. *United States*, 579 U.S. 162, 171 (2016) ("In statutory construction, we begin 'with the language of the statute.' If the statutory language is unambiguous and 'the statutory scheme is coherent and consistent'—as is the case here—

46

'[t]he inquiry ceases.'" (alteration in original) (quoting *Barnhart* v. *Sigmon Coal Co.*, 534 U.S. 438, 450 (2002))); *see also Awuku-Asare* v. *Garland*, 991 F.3d 1123, 1129 n.5 (10th Cir. 2021) (noting we do not "consider regulatory language after finding a statute unambiguous").

We therefore disagree with the district court and conclude the Skilled Nursing InterQual Criteria are not "other instruments" under § 1024(b)(4).[17] We reverse the district court's ruling in this respect.[18]

**3**

The district court's grant of summary judgment in Plaintiffs' favor on their ERISA disclosure claim is affirmed in part and reversed in part. Because of our partial reversal, we now consider whether we must vacate the district court's award of statutory penalties under 29 U.S.C. § 1132(c)(1)

---

[17] To be clear, the district court's ruling in this instance was flawed because of its reliance on a regulation in the face of an unambiguous statute. Whether such criteria should be disclosed under ERISA's claims-procedure provision, 29 U.S.C. § 1133, is unrelated to whether such criteria are "other instruments" under § 1024(b)(4).

[18] We save for another day the interplay between § 1024(b)(4) and § 1185a(a)(4), which states "criteria for medical necessity determinations made under the plan with respect to mental health or substance use disorder benefits (or the health insurance coverage offered in connection with the plan with respect to such benefits) shall be made available by the plan administrator . . . upon request." 29 U.S.C. § 1185a(a)(4). Plaintiffs do not present that argument on appeal, and the district court did not consider the impact of § 1185a(a)(4) in its analysis.

and remand for recalculation. "A district court's assessment of . . . penalties under 29 U.S.C. § 1132(c) is reviewed for an abuse of discretion." *Deboard* v. *Sunshine Mining & Refin. Co.*, 208 F.3d 1228, 1244 (10th Cir. 2000). On appeal, Defendants ask us to "reverse the district court's findings that [Defendants] violated . . . ERISA's disclosure requirements, and reverse the award[] of statutory penalties." Opening Br. at 20. Plaintiffs maintain "the district court correctly awarded [them] statutory penalties." Resp. Br. at 28. But the parties advance no arguments about how we should proceed if this court affirms the district court as to one of the ERISA disclosure violations and reverses as to the other. As we explain, vacatur and remand is unnecessary under the circumstances.

Recall, under 29 U.S.C. § 1132(c)(1), a court may award damages for violations of § 1024(b)(4) "in the amount of up to $100 a day from the date of [the] failure or refusal" to disclose documents. Plaintiffs first requested the ASA and Skilled Nursing InterQual Criteria on February 27, 2018. Defendants never disclosed the ASA, but they produced the Skilled Nursing InterQual Criteria on October 8, 2020.

"[F]or Defendants' failure to disclose the ASA," the district court imposed "a penalty of $100 per day from February 27, 2018—the date of the Family's first written [disclosure] request—through the date of this Order,"

48

August 10, 2021. App. I at 264. The district court then observed the dates

of Defendants' refusal to disclose the Skilled Nursing InterQual Criteria—

from February 27, 2018 until October 8, 2020—coincided with the

timeframe during which Defendants refused to disclose the ASA. "Although

Defendants also failed to provide the Family with the requested InterQual

Criteria from February 27, 2018 through October 8, 2020, the court will not

impose simultaneous penalties per violation for withholding both

documents for th[is] period," the district court determined. App. I at 264. In

other words, the district court imposed a single penalty of $100 per day—

even though the court found two discrete § 1024(b)(4) violations each day.

This penalty totaled $123,100.[19]

   We leave undisturbed the statutory penalty imposed by the district

court. Although we reverse the district court's holding that Defendants

violated § 1024(b)(4) by refusing to disclose the Skilled Nursing InterQual

Criteria, the district court's calculation of a statutory penalty properly

reflects the amount due for Defendants' failure to disclose the ASA from

---

[19] In calculating this penalty, the district court "[s]ubtract[ed] thirty days for the period in which Defendants could have timely responded to Plaintiffs' requests." App. I at 264. The period from February 27, 2018 until August 10, 2021 spans 1,261 days. The $123,100 total thus reflects a penalty of $100 per day for a total of 1,231 days.

February 27, 2018 through August 10, 2021. The district court specifically chose not to "impose simultaneous penalties"—that is, the $123,100 penalty would have been imposed even if the only disclosure violation found under § 1024(b)(4) was based on the ASA. *See* App. I at 264. Under these unusual circumstances, the penalty amount is unchanged by our partial reversal on the ERISA disclosure claim and remand for recalculation of the statutory penalty is unnecessary. No party argues otherwise.

## B

Finally, we consider Defendants' challenge to the district court's award of attorneys' fees and costs to Plaintiffs under 29 U.S.C. § 1132(g)(1).

Under 29 U.S.C. § 1132(g)(1), in an action brought "by a participant, beneficiary, or fiduciary" of a plan regulated under ERISA, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." "A court may award fees and costs under 29 U.S.C. § 1132(g)(1) as long as the fee claimant has achieved 'some degree of success on the merits.'" *Cardoza*, 708 F.3d at 1207 (quoting *Hardt*, 560 U.S. at 255). "[T]his court reviews the district court's fee decision for an abuse of discretion." *Id.*

Recall, after the district court entered its Summary Judgment Order, Plaintiffs moved for attorneys' fees and costs under § 1132(g)(1). They maintained the district court's ruling on summary judgment "constitutes a

significant degree of success on the merits in this case and justifies an award of attorney fees and costs." Supp. App. at 42. To that end, they requested $69,240 in attorneys' fees and $400 in costs.

Defendants did not meaningfully oppose that request in the district court, explaining they "will not challenge Plaintiffs' recovery of an award of $69,240 in attorney fees and $400 in costs." Supp. App. at 105. Defendants did, however, "reserve their rights to appeal the underlying orders and therefore *on that basis* to appeal the award of fees and costs or interest." Supp. App. at 105 (emphasis added). The district court granted Plaintiffs' motion for attorneys' fees, "[c]onsidering Defendants' non-opposition." App. II at 296.

On appeal, Defendants claim "[t]he district court's award of costs and attorneys' fees to [Plaintiffs] was erroneous."[20] Opening Br. at 51. This argument is tethered to Defendants' primary contention that summary judgment was granted in error on the Plaintiffs' Parity Act and ERISA disclosure claims, so there was no basis for an award of fees and costs. We discern no abuse of discretion.

---

[20] Defendants do not specify our standard of review, which, as we have explained, is abuse of discretion. *See Cardoza* v. *United of Omaha Life Ins. Co.*, 708 F.3d 1196, 1207 (10th Cir. 2013).

Defendants' argument is premised on this court reversing in its entirety the district court's grant of summary judgment to Plaintiffs. Because Plaintiffs lacked standing to pursue their Parity Act claim, Defendants are correct that claim cannot serve as the basis for an attorneys' fees award.[21] But we affirm in part the grant of summary judgment in Plaintiffs' favor on their ERISA disclosure claim. All that is required to sustain the award of fees and costs under 29 U.S.C. § 1132(g)(1) is "some degree of success on the merits." *Cardoza*, 708 F.3d at 1207 (quoting *Hardt*, 560 U.S. at 255). Plaintiffs' success on their ERISA disclosure claim thus forms a legitimate basis for the award.[22] We therefore affirm the district court's award of attorneys' fees and costs.

---

[21] We note that, on appeal, Defendants did not seek a remand for recalculation of attorneys' fees under § 1132(g)(1) in the event of a partial reversal. Rather, Defendants' appellate position on the fee issue is wholly derivative of their overall argument that Plaintiffs have *no* successful claims. Nor would such a remand be appropriate in this case. The record confirms the district court's fee award was not based on any level of success on the alleged Parity Act claim. Indeed, the district court awarded attorneys' fees in the same order where it found Plaintiffs had no remedy for a Parity Act violation. And there is no question Plaintiffs have "achieved 'some degree of success on the merits,'" *Cardoza*, 708 F.3d at 1207, given our affirmance, in part, on their ERISA disclosure claim.

[22] Indeed, in their reply brief, Defendants appear to concede that a finding of an ERISA violation on its own is "sufficient to support a fee award." Reply Br. at 31.

## IV

We **VACATE** the grant of summary judgment to Plaintiffs on their Parity Act claim and **REMAND** with instructions to dismiss that claim for lack of standing. We **AFFIRM** the grant of summary judgment in Plaintiffs' favor on their ERISA disclosure claim as to the ASA and the corresponding statutory penalty, but we **REVERSE** as to the Skilled Nursing InterQual Criteria. We **AFFIRM** the district court's award of attorney's fees and costs.